SEINERS ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3212–71. Filed September 20, 1972.

*Joseph T. Mijich,* for the petitioner.
*Thomas N. Tomashek,* for the respondent.

FAY, *Judge:* Respondent determined deficiencies in the Federal income taxes of petitioner as follows:

| Taxable year ended | Deficiency |
| --- | --- |
| Nov. 30, 1965 | $527.00 |
| Nov. 30, 1966 | 1,360.86 |
| Nov. 30, 1967 | 3,721.10 |

The issue for decision is whether petitioner is entitled to deduct as patronage dividends under section 1382(b)(1) or 1382(b)(2)[1] amounts of money and scrip distributed to its members with respect to the years ended November 30, 1966, and November 30, 1967.[2]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner Seiners Association (hereinafter referred to as Seiners or petitioner) is a nonexempt cooperative organized under the laws of the State of Washington. At the time of filing the petition herein

---

[1] All section references are to the Internal Revenue Code of 1954.
[2] The year 1965 is involved solely because of an adjustment arising from the disallowance of deductions for the patronage dividends. There were further adjustments of charitable contributions. These also are related to these disallowed deductions.

petitioner had its principal office in Seattle, Wash. Petitioner filed its Federal income tax returns (Form 1120) for the taxable years ended November 30, 1965, 1966, and 1967, with the district director of internal revenue, Tacoma, Wash.

The name "Seiners Association" was adopted effective December 1, 1965. Prior to that date petitioner was known as Purse Seine Vessel Owners Marketing Association. No capital stock in petitioner has been issued or authorized. A member of petitioner is issued a membership certificate which entitles each member to one vote.

The general policy of petitioner was to sell fishing gear, marine fuel, and insurance primarily to its members. At the end of each fiscal year petitioner determined the total amount of all "member rebates" on the basis of the purchases that the members had made during that fiscal year. Petitioner took the position that it could then declare, but not actually pay in cash, the full amount of this member rebate figure as a patronage dividend and deduct such amount from its taxable income as provided for in section 1382. Petitioner was intent on creating a capital fund and provided for this by retaining a portion of the declared patronage dividend and distributing to the member his "rebate" in the form of 20-percent cash and a revolving fund certificate representative of the retained 80 percent. Petitioner assumed that the members would then declare the entire distribution in their income tax as a patronage dividend.

To effectuate this general policy, the bylaws of Seiners provide in pertinent part:

### ARTICLE VI

#### ASSOCIATION REVOLVING CAPITAL

Section 1.—Revolving Capital Funds Created. There is hereby created a fund to be designated and carried on the books of the association as the "Revolving Capital Fund," by which term it is herein referred to. In the event that in addition to marketing the fishery products of its members this association shall render other services to its members, such as the supplying of gear, tackle, stores, equipment and supplies used on fishing boats or furnishing dock or berthing space or the financing of fishing boats and equipment or if this association shall engage in any other activities in pursuance of the other purposes of the association referred to in Article II, Section 1 of these By-Laws, then the Board of Directors, in its absolute discretion, may create more than one Revolving Capital Fund, provided that one such fund, and no more than one, shall be created and maintained with respect to all marketing of fishery products by the association and one or more such funds may be created and maintained with respect to other activities or operations of the association.

Section 2.—Deductions for Revolving Capital. From any money otherwise payable to each member, from time to time, there shall be deducted, withheld and retained by the association (in addition to other association charges and withholdings) such amounts as the Board of Directors, from time to time, shall

fix and designate, and such amounts shall be placed in said Revolving Capital Fund or Funds.

Section 3.—Allocation and Notification. The amounts so retained and placed in said revolving capital fund or funds shall be allocated and credited on the books of the association on a proportionate or value basis to the credit of the respective members from whom retained, according to the respective amounts to which each member would have been entitled if current distribution had been made in cash in lieu of retention by the association. As soon after the conclusion of each calendar or fiscal year of the association as conveniently may be done, the Board shall cause to be mailed or delivered to each member a statement showing the amount or proportionate part of the total amount retained from such member and placed in such revolving capital fund or funds to the credit of such member. Such notification shall be in the form and shall contain such information as the Board shall prescribe. The association may, but shall not be required to, issue certificates of revolving capital interest to the members showing their respective interests in the revolving capital fund or funds, and any such certificates, if and when issued, shall be in such form and shall contain such information and shall be issued and accepted under such terms and conditions as may be determined, from time to time, by the Board of Directors.

\* \* \* \* \* \* \*

Section 6.—Revolution of Fund. At the end of each calendar or fiscal year, or at such other time as the Board of Directors may elect, the Board shall determine what part, if any, of the moneys in said revolving capital fund or funds (including those retained for the revolving capital fund or funds during such calendar or fiscal year) are not then needed and will not be required for use by the association. \* \* \* *No person in interest shall have or possess any vested right or interest in any revolving capital fund of the association, or any part thereof, unless and until payment or distribution thereof is ordered by action of the Board of Directors.*

\* \* \* \* \* \* \*

Section 9.—Dissolution. In the event of the dissolution or winding up of the affairs of the association, all the indebtedness represented by said revolving fund credits or certificates of revolving capital interest shall be deemed due, *but shall not be paid in any part until all other indebtedness of the association has been paid, or its payment adequately provided for.* Thereafter, said revolving fund credits or certificates of revolving capital interest shall be paid (to the extent of available funds) without regard to the time or year retained or to the classification of funds, or to the priorities applicable in the case of revolution of the fund or funds.

[Emphasis added.]

Article VI, section 11, of petitioner's bylaws was adopted on January 16, 1965. Notice of Adoption of By-Law Provision with respect thereto was mailed to each member of petitioner within a month or two after its adoption. Such notice was made available to both old and new members. Article VI, section 11, of the bylaws provides as follows:

Section 11.—Consent of Member to Include Amount of Revolving Fund Certificate as Gross Income. Each person who hereafter applies for and is accepted to membership in this association and each member of this association on the effective date of this By-Law who continues as a member after such date shall,

by such act alone, consent that the amount of any distributions with respect to his patronage occurring after December 1, 1963 which are made in revolving fund certificates or other written notices of allocation (as defined in 26 U.S.C. 1388) and which are received by him from the association, will be taken into account and included in his gross income at their stated dollar amounts in the manner provided in 26 U.S.C. 1385(a) in the taxable year in which such written notices of allocation are received by him.

During the 1966 and 1967 taxable years each member of the petitioner who was entitled to a patronage dividend by reason of his purchases received a receipt or invoice at the time of his purchases, reflecting the proper amount of each purchase. The measure of the amount of the potential patronage dividend attributable to each individual member could be determined by multiplying the member's total purchases for the year by a particular percentage factor which was set forth in the respective financial statements for the years 1966 and 1967. These percentage factors were 2.039 percent for fiscal 1966 and 3.355 percent for fiscal 1967.

Following the close of the 1966 and 1967 taxable years, petitioner, pursuant to notice, held annual membership meetings on January 21, 1967, and January 27, 1968. One of the first orders of business at these meetings was to have a representative of petitioner's accounting firm review the financial statements in detail.

The financial statement basically reflected petitioner's income for the year, total amount available for "members' rebates," and the percentage factor upon which individual rebates should be calculated.

A majority of the members attended these meetings at which the financial statements were distributed. The remaining members for the most part were given easy access to the information contained therein. At the time the annual meetings took place the dividends had actually been credited on the books of petitioner as a liability in toto.

The comparative statement of income and surplus distributed at the January 21, 1967, meeting showed the sum of $8,502.23 as "Members' Rebates" with a footnote stating that such amount "represents 2.039% of sales to members for 1965–1966." The sum of $8,502.23 comprised the total potential patronage dividends payable by petitioner for the year ended November 30, 1966.

The comparative statement of income and surplus distributed at the meeting of January 27, 1968, showed the sum of $16,261 as "Members' Rebates" with a footnote stating that such amount "Represents 3.355% of sales to members for 1966–1967." The sum of $16,261 comprised the total potential patronage dividends payable by petitioner for the year ended November 30, 1967.

Generally, each member kept his own record of purchases because most of the items purchased from petitioner were expense items. How-

ever, petitioner had its own records for purposes of determining the individual's allocable patronage dividend and the members were not required to have their receipts in order to qualify for the receipt of the proper patronage dividend.

If a member had kept all of his records he could have determined his allocable patronage dividend by multiplying the percentage figure given in the financial statements by the amount of his purchases for the year. However, the financial statements which were distributed at the annual meetings did not by themselves contain sufficient information to compute each individual member's allocable share.

On August 18, 1967, each member of petitioner was sent a check for 20 percent of his allocated amount for the year ended November 30, 1966, plus a revolving fund certificate for the 80-percent balance.

On September 18, 1968, each member of petitioner was sent a check for 20 percent of his allocated amount for the year ended November 30, 1967, plus a revolving fund certificate for the 80-percent balance.

The revolving fund certificates dated August 18, 1967, and September 18, 1968, sent to the members read as follows:

This is your Revolving Fund Certificate advising you of the amount you have earned during the Association's [1966 or 1967] fiscal year.

Your total computed rebate for the year [1966 or 1967] is $       based on your gear, marine fuel, and insurance. A draft for 20% of this amount is enclosed. The balance will be paid at the discretion of the Board of Directors.

Remember, due to the Federal ruling governing cooperatives and/or associations, the law states that you are to report the full amount as indicated above for tax purposes.

The actual payment periods, as prescribed by statute, for the years ended November 30, 1966, and November 30, 1967, were August 15, 1967, and August 15, 1968, respectively.

At least 95 percent of the members of petitioner during the years 1966 through 1968 were individuals who reported their income for Federal income tax purposes each calendar year on the cash basis.

Petitioner for the taxable years 1966 and 1967 deducted $8,502.23 and $16,261, respectively, as a distribution of patronage dividends deductible under section 1382(b). Respondent in his notice of deficiency increased petitioner's taxable income to reflect the disallowance of these deductions in their entirety.

### ULTIMATE FINDING OF FACT

Petitioner's financial statements, distributed at its annual meetings for taxable years 1966 and 1967, coupled with the receipts the members received upon purchasing goods from petitioner, did not constitute written notices of allocation.

The question before this Court involves the deductibility of certain items under either section 1382(b)(1) or 1382(b)(2).[3] The effect of section 1382(b) is to allow a cooperative to reduce its taxable income when "patronage dividends" are properly distributed within the terms of the statute.

Petitioner claims that under section 1382(b)(1) all, or under section 1382(b)(2) at least part, of the scrip and monetary amounts distributed by it are deductible. To justify a deduction under either of these sections, it is imperative for purposes of the case at bar to initially find that "written notices of allocation," as defined by section 1388(b), had been distributed by petitioner within the proper time periods. Absent such a finding, all of petitioner's arguments for deductibility are to no avail.

Therefore, our finding that the financial statements in question did not constitute "written notices of allocation" is dispositive. However, for purposes of complete accuracy we will, in this opinion, answer all of petitioner's subsequent contentions.

Petitioner's complete argument is as follows:

(1) Certain financial statements distributed at petitioner's annual meetings, combined with receipts that each individual member received for purchases during the year, constituted written notices of allocation as defined in section 1388(b) which were distributed within the proper statutory time periods.

(2) These written notices of allocation were converted to "qualified

---

[3] SEC. 1382. TAXABLE INCOME OF COOPERATIVES.

(a) GROSS INCOME.—Except as provided in subsection (b), the gross income of any organization to which this part applies shall be determined without any adjustment (as a reduction in gross receipts, an increase in cost of goods sold, or otherwise) by reason of any allocation or distribution to a patron out of the net earnings of such organization or by reason of any amount paid to a patron as a per-unit retain allocation (as defined in section 1388(f)).

(b) PATRONAGE DIVIDENDS AND PER-UNIT RETAIN ALLOCATIONS.—In determining the taxable income of an organization to which this part applies, there shall not be taken into account amounts paid during the payment period for the taxable year—

(1) as patronage dividends (as defined in section 1388(a)), *to the extent paid in money, qualified written notices of allocation* (as defined in section 1388(c)), or other property (except nonqualified written notices of allocation (as defined in section 1388(d))) with respect to patronage occurring during such taxable year;

(2) in money or other property (except written notices of allocation) in *redemption of a nonqualified written notice of allocation* which was paid as a patronage dividend during the payment period for the taxable year during which the patronage occurred;

\*        \*        \*        \*        \*        \*        \*

For purposes of this title, any amount not taken into account under the preceding sentence *shall,* in the case of an amount described in paragraph (1) or (2), *be treated in the same manner as an item of gross income and as a deduction therefrom,* and in the case of an amount described in paragraph (3) or (4), be treated as a deduction in arriving at gross income.

[Emphasis added.]

written notices of allocation" as required by section 1382(b)(1) due to either of the following circumstances:

(a) There was constructive receipt within the required payment period of at least 20 percent of the dividends by virtue of each individual member's ability to collect his dividend at any time after it was declared.

(b) In order to qualify as a written notice of allocation, actual payment need not be made within the same payment period as the receipt of the written notice of allocation.

In an alternative argument, petitioner claims a deduction for a lesser amount under section 1382(b)(2).

Petitioner in its alternative argument contends that for the taxable year 1966 the financial statements received by the members qualify as "nonqualified written notices of allocation," and that these notices were partially redeemed by the checks distributed on August 18, 1967. Petitioner argues that it is therefore entitled to a deduction in its 1967 return under section 1382(b)(2), to the extent of this partial redemption.[4]

Essentially, the situation before us is that there are very definite rules which must be met in order for a cooperative to deduct patronage dividends from its taxable income.[5] The first of these requirements is that

---

[4] Petitioner claims the argument applies equally to payments made in 1968 reflecting redemptions of fiscal 1967 nonqualified notices. However, petitioner on brief recognizes that 1968 is not at issue before this Court and it does not propose that we take any action for 1968.

[5] The background of the law in regard to patronage dividends and subch. T (dealing with the taxation of cooperatives and their patrons) is as follows:

Prior to legislation enacted in 1951 there were numerous cases and administrative rulings which recognized the rights of nonexempt cooperatives to exclude patronage dividends. See for example *Puget Sound Plywood, Inc.*, 44 T.C. 305 (1965), and *Farmers Cooperative Co. v. Birmingham*, 86 F. Supp. 201 (N.D. Iowa 1949).

It was generally thought that the 1951 legislation would insure that earnings of cooperatives would be currently taxable (to the extent they reflected business activity) either to the cooperatives or to the patrons. See H. Rept. No. 1447, 87th Cong., 2d Sess., 1962–3 C.B. 482; and S. Rept. No. 1881, 87th Cong., 2d Sess., 1962–3 C.B. 817. However, following the enactment of the 1951 legislation certain court decisions turned the cooperative area into a revenue collector's nightmare. The notable cases in this area are: *Commissioner v. Carpenter*, 219 F. 2d 635 (C.A. 5, 1955), affirming 20 T.C. 603 (1953), holding that a cash basis taxpayer and member of a cooperative need not include in his gross income the face amount of refund certificates issued by a farmer cooperative when those certificates had no fair market value at the time of issue; and *Long Poultry Farms v. Commissioner*, 249 F. 2d 726 (C.A. 4, 1957), reversing 27 T.C. 985 (1957), holding that an accrual basis taxpayer and member of a cooperative did not properly accrue as an item of income a patronage refund credit for the year in which it was allocated to the taxpayer's account by the marketing cooperative if the right to receive payment was not definite and certain in that year. See also *Caswell's Estate v. Commissioner*, 211 F. 2d 693 (C.A. 9, 1954), reversing 17 T..C. 1190 (1952); and *Moe v. Earle*, 226 F. 2d 583 (C.A. 9, 1955). While the above cases permitted the cooperative's patrons to exclude certain distributions from income, the cooperatives continued to deduct these very same distributions as proper distributions of patronage dividends. See for example *Farmers Cooperative Co. v. Commissioner*, 288 F. 2d 315 (C.A. 8, 1961), reversing 33 T.C. 266 (1959). When faced with this obvious inconsistency, the court in *Long Poultry Farms v. Commissioner, supra* at 731,

distributions which would otherwise meet the requirements of section 1382(b) must be made within the appropriate payment period, defined in section 1382(d) as follows:

(d) PAYMENT PERIOD FOR EACH TAXABLE YEAR.—For purposes of subsections (b) and (c)(2), the payment period for any taxable year is the period beginning with the first day of such taxable year and ending with the fifteenth day of the ninth month following the close of such year.* * *

According to this definition the appropriate payment periods for petitioner's 1966 and 1967 taxable years ended on August 15, 1967, and August 15, 1968, respectively. However, distributions by petitioner which would have unquestionably met the requirements of section 1382(b) were not made until August 18, 1967, and September 18, 1968. These distributions therefore cannot be recognized as meeting the requirements, and petitioner correctly does not propose that we stretch the payment period.[6] What petitioner does contend is that certain other documents which were distributed well within the payment period met the definition of written notices of allocation, either qualified or unqualified, and therefore the requirements of section 1382 have been fulfilled. Petitioner claims that the patron's receipt of these documents is a sufficient basis upon which petitioner may claim a deduction.

Certain financial statements were distributed at petitioner's annual meetings. Furthermore, receipts were distributed to members upon their purchase of goods. Petitioner claims that together these documents were sufficient to constitute written notices of allocation, because any individual member in possession of the combined documents could easily determine his allocable share of patronage dividends by multiplying his total purchases for the year (as reflected by total

---

responded as follows: "The answer is that Congress while granting the right to the deduction by the cooperative left the matter of taxing the dividends to the recipients to be dealt with by existing law, making no change whatever with regard thereto, with the result that cash basis taxpayers will report as income patronage dividends * * * when payment thereof is received and accrual basis taxpayers will report them as income for the year in which the right to receive payment becomes reasonably definite and certain."

Faced with the dilemma created by this case law, Congress, in the Revenue Act of 1962, adopted subch. T (secs. 1381–1388) of the 1954 Code so that what was essentially thought to be the law in 1951 would be specifically provided for by statute. See generally H. Rept. No. 1447, 87th Cong., 2d Sess., 1962–3 C.B. 482–483.

It is the interpretation of this 1962 legislation which we are faced with in the present case. In light of subch. T's background it is imperative that we strictly construe the provisions of that subchapter, for it is clear from the legislative history and the state of events in existence prior to the enactment of subch. T that Congress intended the statute be exacting and specific so that cooperatives and their patrons might not be forced back into that unsure state which existed prior to 1962. Moreover, whether sec. 1382(b) was intended to provide for an exclusion or deduction, it is axiomatic that such provisions are a matter of legislative grace and must be strictly construed. See *T. O. McCamant*, 32 T.C. 824, 834 (1959); and *Cooperative Oil Assn.* v. *Commissioner*, 115 F. 2d 666 (C.A. 9, 1940), affirming a Memorandum Opinion of the Board of Tax Appeals.

[6] See for example *Mansuss Realty Co.* v. *Commissioner*, 143 F. 2d 286 (C.A. 2, 1944), affirming 1 T.C. 932 (1943), which strictly applied the payment period provisions of sec. 24(c) of the Revenue Act of 1938 (precursor to sec. 267, 1954 Code).

receipts) by the specific percentage figures set out in the financial statements. We cannot agree that the combination of financial statements and receipts is sufficient to meet the statutory definition of a written notice of allocation. This definition as found in section 1388(b) defines such a notice as follows:

(b) For purposes of this subchapter, the term "written notice of allocation" means any capital stock, revolving fund certificate, retain certificate, certificate of indebtedness, letter of advice, *or other written notice, which discloses to the recipient the stated dollar amount allocated to him by the organization and the portion thereof, if any, which constitutes a patronage dividend.* [Emphasis added.]

The specific words of the statute call for a proper written notice of allocation to disclose to the recipient the *stated dollar amount* allocated to him.

Webster's New International Dictionary (3d ed. 1961) defines the word "stated" in part as follows: "unmistakably known: AVOWED * * * set down explicitly." Can we say that the conglomerate of distributed papers meets the rather specific language of the Code? We think not.

It is a fact that petitioner's members were not even required to keep the cash receipts, which constituted one-half of the vital necessary papers, in order to assure themselves of a patronage dividend. Certainly no stated dollar amount could be determined in the absence of this key element. Even assuming that the members kept adequate records, they would still have been put to the task of making correct calculations to determine the allocable stated dollar amount. Therefore it is obvious that on their face these documents did not reveal a stated dollar amount. The available documents showed no individual dollar amounts whatsoever. Clearly the type of instrument intended by Congress as sufficient to meet the requirements of a written notice of allocation is that notice which petitioner sent out after the close of the payment periods. That petitioner understood as much is apparent by the form of the certificates distributed by it on August 18, 1967, and September 18, 1968. These certificates did specifically reveal to each individual member his allocable stated dollar amount.

Petitioner claims that Rev. Rul. 68–236, 1968–1 C.B. 382,[7] is

---

[7] That revenue ruling in pertinent part reads:

"In order to qualify as a deductible amount to the cooperative within the meaning of section 1.1382–1 of the Income Tax Regulations, a per-unit retain allocation must be paid in the form of a qualified per-unit retain certificate. Section 1388(g) of the Code defines a per-unit retain certificate as any written notice that discloses to the recipient the stated dollar amount of a per-unit retain allocation to him by the distributing cooperative organization. Some cooperatives issue preliminary statements indicating the amount of a per-unit retain allocation (for example, on the receipt issued at the time goods are delivered or on the voucher accompanying a check given as the initial payment for goods when delivered) and then issue a more formal statement after the end of a specified period (i.e., quarterly, semiannually, etc.) indicating the total amount of per-unit retain allocations for that period. Both sets of statements meet the technical definition of a per-unit retain certificate. * * *"

authority for the proposition that any notice (even if contained in more than one document) which discloses to the recipient the amount of his patronage dividend will suffice as a written notice of allocation. This revenue ruling interprets the Code definition of a "per-unit retain certificate" (another type of written notice of allocation). While this ruling does indicate some degree of informality, it still requires the written notice to disclose to each individual his amount of allocation. This is precisely what was not done in the initial documents sent out by petitioner in the present case.

Furthermore, Rev. Rul. 68–236, *supra* at 383, states that "the statement that is uniformly treated by the parties as the formal per-unit retain certificate shall be treated as the certificate *for tax purposes.*" (Emphasis added.) It is clear from all the surrounding facts and circumstances that the informal array of statements which petitioner claims constituted written notices of allocation were not at the time of distribution treated for tax purposes by petitioner or its members as the formal written notices of allocation. To fall within the spirit of the revenue ruling petitioner must be consistent with all of its requirements.

Our holding that petitioner did not distribute written notices of allocation is sufficient to sustain respondent's determination. However, petitioner's further contentions merit discussion. Assuming a proper distribution of written notices of allocation, it is incumbent upon petitioner under section 1382(b)(1) to prove that these notices were "qualified written notices of allocation." Section 1382(b)(1) provides for a deduction to the extent patronage dividends are paid during the payment period in "qualified written notices of allocation." The definition of qualified notices is found in section 1388(c), and provides in pertinent part as follows:

> (c) QUALIFIED WRITTEN NOTICE OF ALLOCATION.—
> (1) DEFINED.—For purposes of this subchapter, the term "qualified written notice of allocation" means—
>
> *        *        *        *        *        *        *
>
> (B) a written notice of allocation which the distributee has consented, in the manner provided in paragraph (2), to take into account at its stated dollar amount as provided in section 1385(a).
> *Such term does not include any written notice of allocation which is paid as part of a patronage dividend or as part of a payment described in section 1382 (c)(2)(A), unless 20 percent or more of the amount of such patronage dividend, or such payment, is paid in money or by qualified check.* [Emphasis added.]

Since the necessary consent as required by section 1388(c)(1)(B) has been recorded by petitioner's members, the only point of contention is whether the 20-percent-payment requirement has been met. Petitioner's first argument on this point is that the members could withdraw their allocated 20 percent at any time before the end of the pay-

ment period and this constituted constructive receipt which is sufficient to satisfy the 20-percent-payment requirement.

Petitioner has not advanced any sound reason for applying the "constructive receipt" doctrine to the distributions in question. Petitioner's bylaws are specific in stating that no person shall have any right to patronage dividends until payment or distribution is ordered by the board of directors. The evidence that such an action was taken by the board of directors is inconclusive. "In no case should the constructive receipt theory apply, we think, unless at some time the earnings of the cooperative were made available to or were subject to the control of the patron." *William A. Joplin, Jr.*, 17 T.C. 1526, 1531–1532 (1952).

Even if we assume that constructive receipt may be present on the facts of this case, we believe that for the following reasons, the doctrine of constructive receipt is not appropriate to this particular area:

(1) It is clear from the legislative history that to incorporate the doctrine of constructive receipt into subchapter T would completely negate the purpose of the 20-percent-payment rule. The purpose of that rule was to assure actual payment rather than constructive payment so that the participating patrons would be able to at least pay the first bracket income tax on the entire qualified written notice of allocation which must be included in income.[8]

(2) The second point negating the application of the constructive-receipt doctrine is that the statute specifically calls for payment in the form of money or qualified check. Similar specific language is found in other areas of the Code and in one recent opinion of this Court we applied a strict interpretation to the term "money" as used in section 1375(f). See *Randall N. Clark*, 58 T.C. 94 (1972). That case leaves little room for doubt that when a statute requires a distribution of money its requirements cannot be met by the application of the constructive-receipt doctrine. We think a similarly strict interpretation of the words "qualified check" is also appropriate.

Petitioner's alternative argument in support of his claim that a "qualified written notice of allocation" was distributed is also totally without merit. In this argument petitioner submits that for purposes of qualification there is no provision in the last sentence of section

---

[8] Senate Finance Committee, S. Rept. No. 1881, 87th Cong., 2d Sess., 1962–3 C.B. 818, states:

"Your committee believes that it would be unfortunate to require the patrons to report these qualified allocations for tax purposes without being sure that the cooperative made available to the patrons enough cash to pay at least the first bracket income tax. To give assurance that the cooperative provides the patron with at least enough money to pay this first bracket tax, your committee has provided that cooperatives must pay at least 20 percent of their patronage dividends (and in the case of tax-exempt cooperatives other income distributed on a patronage basis) in cash if the cooperatives are to receive any deductions for allocations (and the patrons are to be required to include any such amounts in their income.)"

1388(c)(1) which requires that the 20-percent payment be made within the same payment period as the distribution of the written notice of allocation. Therefore, the fact that the check for the 20-percent payment was not mailed until days after the end of the payment period did not disqualify the written notice of allocation.

This argument is refuted by the logic and language of the statute and the relevant legislative history. Section 1382(b)(1) allows a deduction for amounts paid as patronage dividends *during the payment period in qualified written notices of allocation.* Written notices of allocation by definition are not qualified unless 20 percent or more of the amount of payment is paid by money or qualified check. It therefore follows that if the 20-percent payment is not made within the same payment period in which the written notice is distributed, that notice is not a qualified notice when it is distributed within that required payment period and it cannot be considered a distribution which meets the terms of section 1382(b)(1). In this context it is also noteworthy that Conference Report, H. Rept. No. 2508, 87th Cong., 2d Sess., 1962–3 C.B. 1169, in discussing qualification of written notices of allocation, states in pertinent part: "a written notice of allocation is not a qualified one *unless 20 percent or more of the distribution of which it is a part* is paid in money or by qualified check. [Emphasis added.]"

Petitioner makes one final argument in its attempt to salvage at least part of the deduction. Under section 1382(b)(2) petitioner is allowed a deduction for payments in money or other property made in redemption of "nonqualified written notices of allocation" which had been paid as patronage dividends during the proper payment period. A "nonqualified written notice of allocation" is defined in pertinent part in section 1388(d) as follows:

(d) NONQUALIFIED WRITTEN NOTICE OF ALLOCATION—For purposes of this subchapter, the term "nonqualified written notice of allocation" means a written notice of allocation which is not described in subsection (c) [qualified written notice of allocation] * * *

Petitioner contends that if its written notices of allocation did not qualify under section 1388(c) they are nonqualified notices according to section 1388(d) and the 20-percent actual payment of August 18, 1967, was in redemption of 20 percent of these notices. It therefore claims a deduction for the year 1967 to the extent of the actual payments. Again, petitioner's argument is of no value for even nonqualified written notices of allocation are dependent on a finding that the papers distributed within the payment period constituted written notices of allocation. We cannot make this necessary finding.

*Decision will be entered for the respondent.*