**UNION EQUITY COOPERATIVE EX-
CHANGE, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellee.**

No. 72–1722.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted March 30, 1973.

Decided July 2, 1973.

Frank Carter, Enid, Okl. (Otjen &
Carter, Enid, Okl., of counsel, on the
brief), for petitioner-appellant.

Carolyn R. Just, Atty., Tax Div.,
Dept. of Justice (Scott P. Crampton,
Asst. Atty. Gen., Meyer Rothwacks and
Leonard J. Henzke, Jr., Attys., Tax Div.,
Dept. of Justice, on the brief), for re-
spondent-appellee.

Before MURRAH, Circuit Judge,
and DURFEE,* Judge, Court of Claims,
and McWILLIAMS, Circuit Judge.

McWILLIAMS, Circuit Judge.

This is an appeal from the United
States Tax Court. The Union Equity
Cooperative Exchange, hereinafter re-
ferred to as the taxpayer, is an Okla-
homa cooperative marketing association
incorporated under the Oklahoma Coop-
erative Marketing Act, 2 O.S. § 361 et
seq., and the so-called Capper-Volstead
Act, 7 U.S.C. §§ 291–292, and was the
petitioner in the tax court. The Com-
missioner, the respondent in the tax

* Sitting by designation.

court, had determined that there was a deficiency in the taxpayer's income tax for the taxable year ending March 31, 1961, in the sum of $81,266.77, and in the sum of $138,164.30 for the taxable year ending March 31, 1963. The taxpayer sought review of such determination in the tax court and the judge of that court, the Honorable Bruce M. Forrester, in a carefully prepared opinion upheld the determination of the Commissioner. That opinion is now reported at 58 T.C. 397 (1972).

All material facts were stipulated to by the parties before the tax court and are set forth in detail by the tax court in its decision. Accordingly, reference to the facts in this opinion will only be made as is necessary to give meaning to the issues here presented.

The issues now before us are: (1) Was the tax court correct in sustaining the Commissioner's determination that the taxpayer, a nonexempt cooperative in the fiscal year 1963, must charge its 1963 capital stock dividend payments against net earnings derived from members as well as nonmembers, thereby decreasing the amount of the patronage dividend "deduction" allowable to the taxpayer? (2) Was the tax court correct in sustaining the Commissioner's determination that the taxpayer did not sustain an operating loss in the fiscal year ending March 31, 1964, which could be carried back to its fiscal year ended March 31, 1961, since in computing its fiscal 1964 patronage dividend deduction allowable under Subchapter T (Sections 1381–1388 of the Internal Revenue Code of 1954) it must reduce its net earnings by capital stock dividends actually or constructively paid in that year, rather than by dividends which were declared in that year but not paid till the succeeding fiscal year? And (3) was the tax court correct in holding that the Commissioner was not estopped from challenging the taxpayer's method of computation for patronage dividends in the taxable years here in question because agents of the Internal Revenue Service had not previously challenged its method of determining patronage dividends in prior years?

In our view, the tax court acted correctly in its determination of each of these matters and accordingly its decision is affirmed. We shall consider each of these matters separately.

## I. Deficiency for the taxable year ending March 31, 1963.

Under the applicable law for the taxable year 1963, capital stock dividends paid by the taxpayer to its members as a return on their investment were not deductible from taxpayer's net income, the taxpayer in 1963 being a nonexempt farmers' cooperative. However, so-called patronage dividends to its members were deductible. We realize there is some difference of opinion as to whether this is truly a "deduction," or should more properly be referred to as an "exclusion from gross income." Like the tax court, however, we shall refer to it as a deduction.

A patronage dividend represents a return by the taxpayer of the profits realized during a given year to its members in proportion to their dealings with the taxpayer during the year in question. The amounts returned, in whatever qualified form of property, are designed to be a true correction and deferred price adjustment on transactions the cooperative had with its members resulting in a net profit to the cooperative. *See* Consumers Credit Rural Elec. Cooperative Corp. v. Commissioner, 319 F.2d 475 (6th Cir. 1963).

The bylaws of the taxpayer in effect for the year 1963 provided, inter alia, for the payment from net earnings of a dividend not to exceed 5% on outstanding capital stock, with the remainder of net earnings to be distributed to its members as a patronage dividend. The bylaws in effect in 1963 did not provide for patronage dividends to nonmembers. The bylaws also provided for the separate handling of net earnings accrued on business transacted "with or for nonmembers," and the net earnings accrued on business transacted "with or for

members." With this brief background, let us examine the different manner in which the taxpayer and the Commissioner would determine the patronage dividend for 1963.

For the taxable year of 1963, taxpayer's total net earnings derived from business transacted with members and nonmembers before adjustments for patronage dividends and dividends on capital stock were $1,519,884.69. During that taxable year, taxpayer's "member business" constituted 57.18% of its total business, with the remaining 42.82% representing "nonmember business." It is agreed to by the parties, and the tax court proceeded on such premise, that in the absence of evidence to the contrary the Commissioner would assume that taxpayer's dealings with members and nonmembers were equally profitable, and thus that member business for 1963 generated 57.18% of taxpayer's net earnings, with the remainder of the net earnings being generated from nonmember business.

In its determination of the patronage dividend, the taxpayer accordingly first determined that its members generated $869,070.07 of its net earnings, this sum representing 57.18% of its total net earnings. After making certain insignificant deductions, it then distributed to its members $861,795.83 (65% in cash and 35% in capital stock) as a patronage dividend and claimed such amount as a deduction on its 1963 tax return. From that portion of the taxpayer's total net earnings deemed to have been generated from nonmember business, i. e., 42.82% of $1,519,884.69, the taxpayer paid its taxes therefrom and transferred the balance to its general or surplus reserve, and out of the latter declared a 5% capital stock dividend for its members.

It is the Commissioner's position that taxpayer's method of computing its patronage has the effect of charging the dividend on capital stock solely to the earnings generated by nonmember business and that by charging capital stock dividends only to income generated by business done with nonmember patrons, rather than ratably against total income, the taxpayer's net earnings from business done with member patrons is overstated. In his determination of the patronage dividend, the Commissioner accordingly would first deduct the capital stock dividend actually paid its members in 1963 ($439,374.44) from the taxpayer's *total* net earnings and would then allocate 57.18% of the remainder as a patronage dividend for its members. By such computation the Commissioner determined the patronage dividend to be some $223,660.36 less than that claimed by the taxpayer.

As was noted by the tax court, the deduction of patronage dividends from the earnings of a nonexempt cooperative was not explicitly recognized by statute till the Revenue Act of 1962, which added Subchapter T to the Internal Revenue Code of 1954, although the Revenue Act of 1951 had made some reference thereto. However, for many years prior to any statutory recognition of patronage dividends, the allowance of a deduction of true patronage dividend to nonexempt cooperatives had long been an administrative practice of the Treasury Department and the Internal Revenue Service.

In order to qualify as a patronage dividend the Commissioner asserts that the following three requirements must be fulfilled:

1. The allocations must have been made pursuant to a legal obligation which existed at the time the patron transacted his business with the cooperative.

2. The allocations must have been made out of profits or income realized from transactions with the particular patrons for whose benefit the allocations were made, and not out of profits or income realized from transactions with other persons or organizations which were not entitled to participate in such allocations.

3. The allocations must have been made equitably; so that profits realized on the one hand from selling mer-

chandise or services to patrons, and those realized on the other hand from marketing products purchased from patrons, were allocated ratably to the particular patrons whose patronage created each particular type of profit.

In support of the foregoing, *see*, for example, Pomeroy Cooperative Grain Co. v. Commissioner, 288 F.2d 326 (8th Cir. 1961), and Petaluma Co-operative Creamery v. Commissioner, 52 T.C. 457 (1969).

The tax court concluded that the taxpayer's claimed patronage dividend, and more particularly its method of computation, did not meet the second of the three requirements above set out, namely, it failed to satisfy the requirement that the dividend in question "be made out of profits or income realized from transactions with the particular patrons for whose benefit the allocation was made." In thus concluding, the tax court observed as follows:

"On the one hand the stockholder-patron receives a distribution from its cooperative solely in respect of its status as stockholder. This is a normal dividend from net earnings which is not deductible at the cooperative level in the same manner that a distribution of earnings and profits by an ordinary corporation is not deductible at the corporate level. The distributions are based on the stockholder's investment in the cooperative and represent a return on that investment—the greater the investment, the greater the dividend on capital stock.

"On the other hand, the stockholder-patron also receives a distribution solely in respect of its status as patron. This latter distribution is based on its patronage with the cooperative during the year—the greater the patronage, the greater the patronage dividend.

"In attributing the entire dividend paid on capital stock to nonmember business, petitioner is saying, in effect, that its stockholders have invested only in those of petitioner's operations and assets which were used to transact nonmember business. * * * We are unable to find any indication that the stockholders here invested in anything but the undivided totality of petitioner's operations and assets. By following a computational path that fails to reflect the reality underlying its mode of operation, petitioner has substituted accounting fiction for taxable fact.

"Consequently, in the absence of any evidence to the contrary, we uphold respondent's determination that the dividend paid on petitioner's capital stock was properly attributable to net earnings realized from member business and to net earnings realized from nonmember business in proportion to the business transacted with members and nonmembers respectively. Conversely, the amount of member earnings available for distribution as a true patronage dividend would have to be reduced by that part of the dividend on capital stock which was attributable to member earnings."

We generally agree with such reasoning and in support thereof *see* Des Moines County Farm Service Company v. United States, 324 F.Supp. 1216 (S.D.Iowa 1971), aff'd. per curiam, 448 F.2d 776 (8th Cir. 1971); *cf.* Fertile Co-Operative Dairy Ass'n. v. Huston, 119 F.2d 274 (8th Cir. 1941). The *Des Moines* case is virtually on all fours with the instant case and in that case the Eighth Circuit Court of Appeals upheld the trial court's determination that to the extent that payment of a capital stock dividend of a nonexempt cooperative was not charged ratably against *all* net earnings, the *total* amount paid to member patrons as patronage dividends was not excludable from the cooperative's taxable income.

In this court, as in the tax court, the taxpayer relies heavily on United States v. Mississippi Chemical Company, 326 F.2d 569 (5th Cir. 1964). The tax court distinguished that case from the instant case on the ground that there the trial court found as a fact that no part of the

sum paid as a patronage dividend was paid, directly or indirectly, from the profits gained from business transacted with nonmembers and that on appeal the Fifth Circuit Court of Appeals characterized this finding as being "particularly correct"; whereas, in the instant case, according to the tax court, such a finding was not made, and could not have been made, for the reason that in reaching the conclusion that it did "we [the tax court] have necessarily found that a part of the sum which petitioner called a patronage dividend was in fact attributable to profits from nonstock holder business." We need not here debate whether the *Mississippi Chemical Company* case is completely distinguishable from the instant case. It is sufficient to state that the result and reasoning of the *Des Moines County Farm Service Company* case are to us more persuasive than that of *Mississippi Chemical.*

II.  Net operating loss for taxable year ending March 31, 1964, which could be carried back to taxable year ending March 31, 1961.

In 1964 the taxpayer became an organization exempt from tax under Section 521, I.R.C.1954, as contemplated in Section 1381(a)(1), and for that year under applicable tax laws it became entitled to deduct *both* capital stock dividends and patronage dividends from its gross earnings. Int.Rev.Code of 1954, Sections 1381(a)(1), 1382(b)(1), 1382(c)(1), and 1382(c)(2). Accordingly, in its return for that year, the taxpayer reported net earnings before dividends of $750,139.44, and deducted therefrom capital stock dividends paid during that year in the sum of $476,-410.65 and patronage dividends in the sum of $430,013.00, thereby arriving at a claimed net operating loss of $156,284.21 for the year 1964. The taxpayer thereupon applied for and was allowed a tentative adjustment of its taxes for the fiscal year ending March 31, 1961, on account of the carryback of this claimed net operating loss for the fiscal year ending March 31, 1964. Subse-

quently, an examination of the taxpayer's return resulted in the Commissioner's reduction of the amount claimed by the taxpayer as a patronage dividend deduction by $223,660.36 for the year 1964 thus resulting in an elimination of the so-called net operating loss for 1964 and of the claimed carryback to 1961.

In computing its patronage dividend for the year 1964, the taxpayer deducted from its net earnings, among other items, the sum of $245,112.50 *declared* as a capital stock dividend in 1964 but not paid in that taxable fiscal year. In computing its patronage dividends, the taxpayer ignored the fact that in 1964 it had actually paid a capital stock dividend of $476,410.65. By using the lesser sum, the taxpayer inflated the amount properly available for its patronage dividends and the corresponding deduction.

■  At the same time, however, the taxpayer, now being an exempt cooperative, deducted, as it had the right to do, its capital stock dividend, but in so doing deducted the sum of $476,410.65, which was the stock dividend paid in 1964. In other words, the taxpayer was attempting to have the best of two worlds, by using the lesser capital stock dividend figure in computing its patronage dividend figure, and thereby inflating its patronage dividend deduction, but using the greater dividend figure when deducting the capital stock dividend from its net earnings. It was the Commissioner's position that the taxpayer should use the same dividend-on-capital stock figures in both computations and urged that under the applicable statute, *see* Int.Rev.Code of 1954, Section 1388(a)(1), the proper figure is the one which represents the dividend actually *paid* in the year in issue. The tax court upheld that position, and we agree.

The language of Subchapter T, which was applicable to the taxpayer in 1964, as well as the regulations, would appear to require that in calculating a patronage dividend deduction, net earnings available for patronage dividends should first be reduced by the dividends *paid*

on capital stock for the year in question. Int.Rev.Code of 1954, Section 1388(a); Treas.Reg., Section 1.1388–1 (1963). *See* Des Moines County Farm Service Company v. United States, *supra*.

### III. Equitable Estoppel.

The taxpayer argues that the Commissioner is equitably estopped from asserting a deficiency for the year 1963 because the taxpayer's method of determining its patronage dividend by charging its capital stock dividend entirely to earnings derived from nonmember business had been used by the taxpayer from 1950 to and through 1962 and had never been questioned by the Commissioner, even though its returns had from time to time been audited. In this regard we agree with the tax court that the doctrine of equitable estoppel is inapplicable to the present controversy.

It is true that the doctrine of consistency or quasi-estoppel has on occasion been applied to prevent an injustice, but such has been done generally where there has been fraud or unfair conduct on the part of the Commissioner, with some degree of reliance thereon by the taxpayer to the latter's detriment. None of these aspects are present in the instant case.

And to the contrary, it is well established that the Commissioner is not estopped from challenging erroneously reported items where Internal Revenue agents have failed in prior years to challenge similarly erroneously reported items. Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); Massaglia v. Commissioner, 286 F.2d 258 (10th Cir. 1961); and Sanders v. Commissioner, 225 F.2d 629 (10th Cir. 1955). Language in the *Massaglia* case is particularly appropriate:

. "The very nature of government operations requires us to apply the principles of estoppel to its conduct with circumspection. * * * At the same time, we will not allow the government to deal dishonorably or capri-ciously with its citizens. It must not play an ignoble part or do a shabby thing. * * * 'The right and wrong of things and equitable principles have a place in tax matters.' Alamo National Bank v. Commissioner, 5 Cir., 95 F.2d 622. These standards of conduct may impose a duty of consistency on the government as well as the taxpayer. * * * But neither the duty of consistency, nor the principles of equitable estoppel bind the Commissioner to unauthorized acts of his agents * * * nor preclude him from correcting mistakes of law in the imposition and computation of tax liability, including the power to retroactively correct his rulings, regulations and decisions upon which taxpayers have relied. * * *" (Citations omitted.)

Accordingly, the decision of the tax court is affirmed.