STEVENSON CO-PLY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8659–79.    Filed April 23, 1981.

---

*Wesley W. Kirtley,* for the petitioner.
*Leo A. Reinikka, Jr.,* for the respondent.

## OPINION

TIETJENS, *Judge*: Respondent determined a deficiency of $255,028 in petitioner's Federal income tax for 1973. The sole issue for decision is whether, for the purpose of computing the alternative tax under section 1201,[1] a cooperative's section 631(a) gains are excludable or deductible to the extent that the cooperative distributes those gains to its stockholders through patronage dividends.

This case was fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and attached exhibits are incorporated herein by reference.

At the time its petition was filed and at all times material herein, petitioner, a Washington corporation, had its principal place of business at Stevenson, Wash. A corporation Federal income tax return for 1973 was filed on behalf of petitioner at the Internal Revenue Service Center, Ogden, Utah.

Petitioner, Stevenson Co-Ply, Inc. (hereinafter Stevenson or petitioner), incorporated on August 17, 1955, produces and markets plywood and plywood byproducts at its plant in Stevenson, Wash. The basic raw material used in its production is soft wood in the form of logs from various species of timber found in the forests of the Pacific Northwest.

Stevenson secures its logs either by purchasing the logs on the open market or by purchasing stumpage, harvesting the timber, and transporting the logs to its mill. Stevenson buys its timber principally from the U.S. Forest Service, the Bureau of Land Management, and the States of Oregon and Washington.

During 1973, and at all times material herein, Stevenson's stock was held either by its employees or by the corporation as treasury stock. All sales and exchanges of the corporate stock by individual shareholders are subject to the approval of the corporation's board of directors.

On September 25, 1965, petitioner's corporate bylaws were amended to provide that after December 31, 1965, petitioner

---

[1]All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, unless otherwise stated.

would operate as a cooperative within the meaning of sections 1381 et seq.

The principal amendment to petitioner's bylaws consisted of an addition designated as article III and containing six sections. The purpose of this article was to provide rules for the computation of petitioner's net income attributable to work done by stockholder employees and for the allocation and distribution of such net income among the stockholder employees. The rules for the computation and allocation of the amounts distributed to the stockholder employees as patronage dividends, as contained in section 2 of article III, provide:

Total patronage dividends shall equal that part of the net income of the corporation, computed before taxes on income and without deduction for patronage dividends, which is attributable to work done for the corporation by the stockholder employees. Such part shall bear the same ratio to such net income as the total actual hours worked by stockholder employees during the calendar year bears to the total actual hours worked by all employees. * * *

Stevenson's taxable income for 1973 was $1,353,160.[2] Petitioner's net income for 1973 attributable to work done for the petitioner by all employees (before deduction for wages of all employees and patronage dividends) was $7,122,236.[3] In that year, the value of work done for petitioner by its stockholder employees was 82.37 percent of the total value of all work performed by all of petitioner's employees. Petitioner computes that the value of the work done by its stockholder employees in 1973 was $5,866,586 and that the balance of $1,255,650 was attributable to work done by nonstockholder employees. During

---

[2]Originally reported by petitioner to be $1,009,348, this figure was adjusted (increased), as a result of respondent's audit adjustments not at issue herein, to $1,353,160.

[3]As a result of audit adjustments, respondent adjusted (increased) this figure by the following method:

| | |
|---|---|
| Taxable income per return | $1,009,348 |
| Audit adjustments | [1]502,866 |
| Patronage dividend | 2,900,763 |
| Wages—stockholders | 2,279,036 |
| Wages—nonstockholders | 513,458 |
| Nonpatronage interest income | (83,235) |
| Total income attributable to employees | 7,122,236 |

[1]Petitioner's adjusted taxable income for 1973 does not equal petitioner's reported taxable income for taxable year 1973 plus the audit adjustments. A net operating loss carryback from 1975 of $159,054 reduced petitioner's taxable income, but did not reduce net income for the year for purposes of computing patronage for the year.

1973, petitioner paid wages of $2,279,036 to its stockholders and $513,458[4] to its nonstockholder employees. Additionally, petitioner declared, on behalf of its stockholders patronage dividends of $2,900,763. The patronage dividends were paid by petitioner in the form of cash and written notices of allocation and were includable in the incomes of its stockholders.

Stevenson computes that it paid, as patronage dividends, 80.86 percent of the total income available for patronage dividends after deduction of wages paid to its stockholders.

Petitioner's 1973 tax liability is the lower of the amounts computed under section 11 and section 1201(a). Both parties agree that Stevenson's tax liability computed under section 11 is $627,087 after tax credits are allowed.[5]

In 1973, petitioner realized long-term capital gains under section 631(a), i.e., gains from the cutting of timber, of $2,428,428. Respondent determined that petitioner must recognize this amount as gain and calculated petitioner's alternative tax under section 1201(a), after allowable credits are taken, to be $728,528. Because this figure is higher than petitioner's tax liability computed under section 11, respondent determined that petitioner's tax liability for 1973 was $627,087, resulting in a deficiency of $255,028.

Petitioner, however, determined its section 631(a) gains to be $528,668 after reducing $2,428,428 by the portion of those capital gains attributed to petitioner's stockholder employees and included in the patronage dividends paid to them.

In calculating its section 1201(a) liability, Stevenson reduced the $2,428,428 by $1,617,439[6] to take into account the proportion of such amount included in patronage dividends paid to its stockholder employees. After taking into consideration agreed audit adjustments, petitioner determined $810,989 was subject

---

[4]The sum of these figures for wages is greater than the amounts set forth for wages on petitioner's 1973 Federal corporate tax return. Petitioner paid $34,426 of wages which were accounted for as a cost of new equipment it was constructing and $90 of wages which were charged to maintenance. None of the wages in these accounts were shown on the lines for wages on petitioner's return.

[5]For 1973, petitioner was allowed a $14,297 investment tax credit and a $1,633 investment tax carryforward from 1972.

[6]Petitioner computed this amount as follows: $2,428,428 X 0.8237 (proportion of value of work of all employees attributable to stockholder employees) X 0.8086 (proportion of net income attributable to stockholder employees that was actually paid to them as patronage dividends).

to tax as a capital gain under section 1201(a). Petitioner, therefore, computed its tax liability under section 1201(a) to be $481,109, an amount lower than the tax under section 11. After taking into account agreed audit adjustments, petitioner determined its tax deficiency to be $109,050.

Petitioner argues that, for the purpose of computing the alternative tax under section 1201(a), its section 631 gains which are distributed to cooperative stockholder employees in patronage dividends are excludable from the cooperative's gross capital gains because patronage dividends are properly characterized as exclusions from a cooperative's gross income under the conduit theory of cooperatives and under the theory that patronage allocations represent an increase in the cost of goods sold. Alternatively, petitioner asserts that, for section 1201(a) purposes, failure to deduct a cooperative's patronage distributions of section 631(a) gains from its gross income would subject both the cooperative and its shareholder employees to tax on the same earnings and that such double taxation is contrary to the legislative intent of section 1382 and other tax measures governing cooperatives.

By contrast, respondent contends that, for the purpose of computing the alternative tax, petitioner must include the entire amount of section 631(a) gain because no statute or regulation authorizes the deduction which petitioner seeks; rather, section 1.1382–1(b), Income Tax Regs., expressly requires the inclusion of all of petitioner's long-term gain in the alternative tax computation. Additionally, respondent maintains that when petitioner's taxable income for 1973 is computed under section 11, patronage dividends are not taxable income to petitioner, so that petitioner cannot argue that respondent's position violates the "single tax" concept embodied in the Internal Revenue Code (Code).

Section 631(a) provides for an election to treat the cutting of timber for sale or use in the taxpayer's trade or business by a taxpayer who, for more than 6 months, owned or had a contract right to cut such timber, as a sale or exchange.

Section 1201(a) provides:

(a) CORPORATIONS.—If for any taxable year a corporation has a net section 1201 gain, then, in lieu of the tax imposed by sections 11, 511, 821(a) or (c), and 831(a), there is hereby imposed a tax (if such tax is less than the tax imposed by such sections) which shall consist of the sum of a tax computed on the taxable

income reduced by the amount of the net section 1201 gain, at the rates and in the manner as if this subsection had not been enacted, plus—

    (1) in the case of a taxable year beginning before January 1, 1975—

        (A) a tax of 25 percent of the lesser of—

            (i) the amount of the subsection (d) gain, or

            (ii) the amount of the net section 1201 gain, and

        (B) a tax of 30 percent (28 percent in the case of a taxable year beginning after December 31, 1969, and before January 1, 1971) of the excess (if any) of the net section 1201 gain over the subsection (d) gain; and

    (2) in the case of a taxable year beginning after December 31, 1974, a tax of 30 percent of the net section 1201 gain.

Section 1201(d) provides:

    (d) SUBSECTION (d) GAIN DEFINED.—For purposes of this section, the term "subsection (d) gain" means the sum of the long-term capital gains for the taxable year arising—

    (1) in the case of amounts received before January 1, 1975, from sales or other dispositions pursuant to binding contracts (other than any gain from a transaction described in section 631 or 1235) entered into on or before October 9, 1969, including sales or other dispositions the income from which is returned on the basis and in the manner prescribed in section 453(a)(1),

    (2) in respect of distributions from a corporation made prior to October 10, 1970, which are pursuant to a plan of complete liquidation adopted on or before October 9, 1969, and

    (3) in the case of a taxpayer other than a corporation, from any other source, but the amount taken into account from such other sources for the purposes of this paragraph shall be limited to an amount equal to the excess (if any) of $50,000 ($25,000 in the case of a married individual filing a separate return) over the sum of the gains to which paragraphs (1) and (2) apply.

Section 1222(11) defines "net section 1201 gain" as "the excess of the net long-term capital gain for the taxable year over the net short-term capital loss for such year."

Recently, the Supreme Court, in *United California Bank v. United States*, 439 U.S. 180 (1978), held that in computing the alternative tax, an estate could deduct that portion of the net long-term capital gain that was required by the decedent's will to be set aside permanently for charitable purposes within the meaning of section 642(c). In so holding, the Court relied on the theory that section 642(c) serves as a conduit for charitable contributions similar to that provided by sections 661(a) and 662(a), which sections, to avoid double taxation of the estate and its beneficiaries, cause amounts includable in the beneficiaries' gross income to be excludable in computing the estate's alterna-

tive tax. The Court stated "it cannot be said that section 1201(b) *never* permits reduction of the total net long-term capital gain in response to imperatives emerging from other sections of the Code."[7] 439 U.S. at 187. Rather, agreeing with the Second Circuit in *Statler Trust v. Commissioner*, 361 F.2d 128 (2d Cir. 1966), revg. 43 T.C. 208 (1964), the Court reiterated, "the letter of section 1201(b) must yield when it would lead to an unfair and unintended result." 439 U.S. at 199, citing 361 F.2d at 131.

While we have repeatedly taken the position that in calculating the alternative tax, the statute is to be applied strictly so that what is included in gross income in computing the regular tax is also the figure to be used in computing the capital gain portion of the alternative tax,[8] we have acknowledged that exceptions to this precept have been made in cases involving, for example, (1) the capital nature of unamortized expenses of

---

[7]Sec. 1201(b) applies to taxpayers other than corporations; sec. 1201(a) applies to corporations.

[8]In *Weil v. Commissioner*, 23 T.C. 424 (1954), affd. 229 F.2d 593 (6th Cir. 1956), we held that in calculating the capital-gain portion of the alternative tax under sec. 117(c)(2), I.R.C. 1939, the predecessor to sec. 1201, I.R.C. 1954, unused deductions or credits, i.e., amounts which result in a deficit in ordinary income, may not be applied to reduce capital gain. After examining the legislative history of this section, we concluded—

"that Congress intended that the 50 per cent rate be applied to the same amount in computing the capital gain portion of the alternative tax as was included in gross income in computing the regular tax. This express language of the statute carries out the intention of the framers of the 1938 Act, *supra*, that a flat rate of tax on taxable capital gain be an alternative to the tax imposed upon such gain when it is included in gross income and taxed in the regular manner. [23 T.C. at 430–431.]"

Respondent's argument in the instant case appears to reflect our decision in *Weil* that since there is no provision for reducing the excess of net long-term capital gain over net short-term capital gain, we should not deviate from the plain meaning of the statute.

In *Chartier Real Estate Co. v. Commissioner*, 52 T.C. 346 (1969), affd. 428 F.2d 474 (1st Cir. 1970), we followed our position in *Weil* and held that in computing the alternative tax under 1201(a), capital gain income may not be reduced by part of a net operating loss. Finding this case indistinguishable from *Weil*, we held that the 1954 Code provision necessitated the same conclusion as the 1939 statute did in *Weil*.

Similarly, in *Pope & Talbot, Inc. v. Commissioner*, 60 T.C. 74 (1973), affd. per curiam 515 F.2d 155 (9th Cir. 1975), we reaffirmed our decision in *Weil*, holding that in computing the alternative tax under sec. 1201(a), the capital gain from a sec. 631(a) election may not be reduced by the amount of corresponding loss which results from including timber appreciation in the cost of sales.

In these cases, however, we were not concerned with an item such as a patronage dividend which historically has been excluded from gross income. Even if patronage dividends, since the enactment of subch. T in 1962, are to be relabeled deductions, and we are not here deciding they have been so reclassified, they are intrinsically unlike the type of deductions involved in *Weil*, *Chartier Real Estate Co.*, and *Pope & Talbot, Inc.* See discussion in text, pp. 644–645, of the reasons for excluding patronage dividends.

selling securities (*United States v. Memorial Corp.*, 244 F.2d 641 (6th Cir. 1957)); (2) the need to prevent double taxation in the case of a section 691(c) deduction (*Read v. United States*, 320 F.2d 550 (5th Cir. 1963); *Meissner v. United States*, 176 Ct. Cl. 684, 364 F.2d 409 (1966)); and (3) the conduit theory with respect to the taxation of trusts or estates and their beneficiaries (*Statler Trust v. Commissioner, supra*).

We find that this case presents an issue, analogous to the one in *United California Bank*, which requires a similar departure from a literal reading of the statute. While we decline here to decide the knotty question of whether patronage dividends are exclusions or deductions,[9] we hold that, for the purposes of computing the alternative tax under section 1201(a), petitioner is entitled to reduce its section 631(a) gains by the amounts distributed to its cooperative stockholder employees in patronage dividends.

Patronage dividends are payments made to members of a cooperative pursuant to a preexisting legal obligation between the cooperative and its members to the extent that the income distributed is attributable to business done with or for its members and is determined by reference to the organization's net earnings. Sec. 1388(a). They have been excluded from the cooperative's gross income on several theories: (1) Since cooperatives distribute patronage dividends pursuant to existing legal obligations, they are merely conduits of income; see *Dr. P. Phillips Cooperative v. Commissioner*, 17 T.C. 1002, 1010 (1951); *United Cooperatives, Inc. v. Commissioner*, 4 T.C. 93, 105 (1944); (2) the cooperative is acting as an agent or trustee for money which belongs to the patron from the beginning. See *San Joaquin Valley Poultry Products Association v. Commissioner*,

---

[9]For background on this issue, see *Riverfront Groves, Inc. v. Commissioner*, 60 T.C. 435, 440–441 (1973); *Seiners Association v. Commissioner*, 58 T.C. 949, 955–956 n. 5 (1972); *Union Equity Cooperative Exchange v. Commissioner*, 58 T.C. 397, 403 n. 3 (1971), affd. 481 F.2d 812 (10th Cir. 1973); *Farmers Cooperative Co. v. Birmingham*, 86 F. Supp. 201, 217 (N.D. Iowa 1949). The enactment of subch. T in 1962 while on its face appearing to classify patronage dividends as deductions seems only to have continued the confusion in this area. But see *Mississippi Valley Portland Cement Co. v. United States*, 408 F.2d 827, 831 n. 6 (5th Cir. 1969), wherein the Fifth Circuit stated "The intent to treat these payments as exclusions could not be clearer if Congress had used the word 'exclusion.'" Accord, *Des Moines County Farm Service Co. v. United States*, 324 F. Supp. 1216, 1217 and n. 2, 1219 (S.D. Iowa), affd. per curiam 448 F.2d 776 (8th Cir. 1971). See also I. Clark & E. Warlich, "Taxation of Cooperatives· A Problem Solved?" 47 Minn. L. Rev. 997, 1003 n. 24; M. Asbill, Jr., "Final Regs. on co-ops offer some leeway, but IRS stands firm in certain areas," 18 J. Tax. 368, 369 (1963).

136 F.2d 382, 385 (9th Cir. 1943); *Harbor Plywood Corp. v. Commissioner*, 14 T.C. 158, 161 (1950); (3) the cooperative is essentially like a large partnership in which all of the patrons are members. See *Farmers Cooperative Co. v. Birmingham*, 86 F. Supp. 201, 218 (N.D. Iowa 1949); and (4) patronage dividends represent, for a marketing cooperative, an additional cost of goods sold or, for a purchasing cooperative, rebates on purchases made. See *Farmers Cooperative Co. v. Commissioner*, 288 F.2d 315, 317 (8th Cir. 1961).

Before the enactment of subchapter T in 1962, the Internal Revenue Service followed the practice of allowing a cooperative to exclude patronage dividends under the rebate or additional cost of goods sold theory.[10] Similarly, we recognized the propriety of excluding patronage dividends from a cooperative's gross income. See *Puget Sound Plywood, Inc. v. Commissioner*, 44 T.C. 305, 318–319 (1965); *Farmers Cooperative Co. v. Commissioner*, 33 T.C. 266, 267–268 (1959), revd. on other grounds 288 F.2d 315 (8th Cir. 1961). While the enactment of subchapter T has only added to the confusion of whether patronage dividends are exclusions or deductions,[11] its enactment was primarily designed to insure that income derived from the use of a cooperative would be taxable either to the cooperative or to the patron and to close the gaps whereby neither had to pay taxes on these amounts. *Riverfront Groves, Inc. v. Commissioner*, 60 T.C. 435, 440–441 (1973). See *Seiners Association v. Commissioner*, 58 T.C. 949, 955 n. 5 (1972).

Despite some question since the enactment of subchapter T about whether patronage dividends are to be classified as deductions and not exclusions, there has never been any doubt that Congress consistently has intended to avoid the double taxation of the cooperative and its patrons. Like the Supreme Court in *United California Bank v. United States, supra,* with respect to avoiding the double taxation of an estate and its beneficiaries, we conclude that to prevent a violation of the single tax concept with regard to cooperatives, in computing its

---

[10]See, e.g., *Union Equity Cooperative Exchange v. Commissioner, supra* at 403 n. 3; *Puget Sound Plywood, Inc. v. Commissioner,* 44 T.C. 305, 318 (1965); *Des Moines County Farm Service Co. v. United States, supra* at 1219.

[11]See note 9 *supra.*

alternative tax on capital gains, the cooperative may deduct its patronage dividends.

We reject respondent's argument, which he concedes is essentially similar to the Government's position in *United California Bank*, that the taxpayer may choose to compute its tax under section 11 and may thereby avoid any double taxation of patronage dividends. Likewise, we refuse to distinguish *United California Bank* on the ground that the Court primarily rested its decision on its concern over the impact the Government's position would have on charities since we interpret *United California Bank* as focusing on the avoidance of a double taxation on an estate and its beneficiaries. Finally, we do not read section 1.1382–1(b), Income Tax Regs., as expressly proscribing the result reached herein. The regulation does not address the reduction of a cooperative's long-term capital gains for the purpose of computing the alternative tax on capital gains, but, similar to the statutory provisions of subchapter T, seems to state that patronage dividends are not exclusions but are deductions from gross income.

*Decision will be entered under Rule 155.*