UNITED CALIFORNIA BANK ET AL., CO-EXECUTORS
*v.* UNITED STATES

No. 77–1016.   Argued October 4, 1978—Decided December 11, 1978

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, and POWELL, JJ., joined. STEVENS,

J., filed a dissenting opinion, in which STEWART and REHNQUIST, JJ., joined, *post,* p. 200.

*Ronald E. Gother* argued the cause for petitioners. With him on the briefs was *Marc R. Isaacson.*

*Assistant Attorney General Ferguson* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Stuart A. Smith,* and *Jonathan S. Cohen.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Under the provisions of the Internal Revenue Code of 1954 in effect during the years in question, taxpayers, including decedents' estates,[1] with net long-term capital gains exceeding net short-term capital losses, paid either a "normal" income tax calculated by applying ordinary graduated rates to taxable income computed with a 50% capital-gains deduction permitted by § 1202 of the Code or, if it was a lesser sum, the alternative tax calculated as directed by § 1201 (b).[2] Under

---

[1] Subchapter J of the Code, 26 U. S. C. § 641 *et seq.* (1964 ed.), deals with the taxation of estates, trusts, beneficiaries, and decedents. Section 641 (b) provides that the tax on estates and trusts "shall be computed in the same manner as in the case of an individual, except as otherwise provided in this part."

[2] Title 26 U. S. C. § 1202 (1964 ed.) provides:

"In the case of a taxpayer other than a corporation, if for any taxable year the net long-term capital gain exceeds the net short-term capital loss, 50 percent of the amount of such excess shall be a deduction from gross income. In the case of an estate or trust, the deduction shall be computed by excluding the portion (if any), of the gains for the taxable year from sales or exchanges of capital assets, which, under sections 652 and 662 (relating to inclusions of amounts in gross income of beneficiaries of trusts), is includible by the income beneficiaries as gain derived from the sale or exchange of capital assets."

Title 26 U. S. C. § 1201 (b) (1964 ed.) provides:

"(b) Other taxpayers.

"If for any taxable year the net long-term capital gain of any taxpayer (other than a corporation) exceeds the net short-term capital loss, then, in lieu of the tax imposed by sections 1 and 511, there is hereby imposed

the latter section the taxable income for normal tax purposes was first reduced by the portion of the capital gain remaining in that figure, and the regular tax rates were then applied to the resulting amount. To this partial tax was added an amount equivalent to 25% of the "excess of the net long-term capital gain over the net short-term capital loss."

The issue here involves the computation of the alternative tax of a decedent's estate that had net long-term capital gains,[3] a portion of which—pursuant to the terms of the decedent's will—was "during the taxable year, paid or permanently set aside" for charitable purposes within the meaning of § 642 (c), 26 U. S. C. § 642 (c) (1964 ed.). That section permitted an estate to deduct "without limitation" amounts designated for charitable purposes by the controlling instrument, subject, however, to "proper adjustment . . . for any deduction allowable to the estate or trust under section 1202 . . . ."[4]

a tax (if such tax is less than the tax imposed by such sections) which shall consist of the sum of—

"(1) a partial tax computed on the taxable income reduced by an amount equal to 50 percent of such excess, at the rate and in the manner as if this subsection had not been enacted, and

"(2) an amount equal to 25 percent of the excess of the net long-term capital gain over the net short-term capital loss."

[3] Because the estate incurred no short-term or long-term capital losses in 1967 and 1968, for brevity's sake we sometimes speak simply of "net long-term capital gain" or "capital gain."

[4] Title 26 U. S. C. § 642 (c) (1964 ed.) provides in relevant part:

"(c) Deduction for amounts paid or permanently set aside for a charitable purpose.

"In the case of an estate or trust (other than a trust meeting the specifications of subpart B) there shall be allowed as a deduction in computing its taxable income (in lieu of the deductions allowed by section 170 (a), relating to deduction for charitable, etc., contributions and gifts) any amount of the gross income, without limitation, which pursuant to the terms of the governing instrument is, during the taxable year, paid or permanently set aside for a purpose specified in section 170 (c), or is to be used exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, or

I

Walter E. Disney, who died in 1966, left 45% of the residue of his estate by will to a designated charitable trust. During the years 1967 and 1968, petitioners, executors of the estate, sold securities making up part of the residue of the estate, thereby realizing a long-term capital gain in the amount of $500,622.38 in 1967 and $1,058,018.43 in 1968. There were no short-term capital losses, but a net short-term capital gain of $16,944.16 was realized in 1967. Forty-five percent of the net long-term capital gain was set aside as part of the residue of the estate for the benefit of the specified charity. In their fiduciary income tax returns for these years, the executors sought to use the alternative tax prescribed by § 1201 (b). In computing this tax, they excluded from the long-term capital gain to which the alternative tax was applicable the 45% portion of long-term gain permanently set aside for charity. The District Director disallowed this exclusion, without which the alternative tax was higher than the normal tax computed with the § 1202 capital-gains deduction. The normal tax rather than the alternative tax was therefore due.

for the establishment, acquisition, maintenance or operation of a public cemetery not operated for profit. For this purpose, to the extent that such amount consists of gain from the sale or exchange of capital assets held for more than 6 months, proper adjustment of the deduction otherwise allowable under this subsection shall be made for any deduction allowable to the estate or trust under section 1202 (relating to deduction for excess of capital gains over capital losses). . . ."

Where the § 642 (c) charitable set-aside includes net long-term capital gain, the adjustment avoids a redundant subtraction of income destined for charitable beneficiaries. Its effect is to reduce the charitable deduction by one-half so as to reflect that part of the deduction already included in the 50% capital-gain deduction under § 1202. As indicated later in the text, the parties are not in dispute as to the interworkings of §§ 1202 and 642 (c). It is agreed, moreover, that the set-asides at issue were intended for a charitable entity within the meaning of 26 U. S. C. §§ 170 (c) (2), 501 (c) (3) (1964 ed.). Section 170 permits deductions for contributions to charitable organizations, and § 501 affords a tax exemption to the organizations themselves.

Additional taxes were assessed and paid, and this suit for refund followed.

Agreeing with the judgment of the Court of Appeals for the Second Circuit in *Statler Trust* v. *Commissioner,* 361 F. 2d 128 (1966), the District Court sustained the executors' position that, in computing the alternative tax under § 1201 (b), any amount deductible by the estate from its gross income as being permanently set aside for charity could be excluded from the net long-term capital gain subject to the alternative tax. The Court of Appeals reversed, 563 F. 2d 400 (CA9 1977), holding that the alternative tax was to be computed on the total excess of net long-term capital gains over net short-term capital losses, unreduced by any amount deductible by the estate as a charitable set-aside under § 642 (c). The court expressly disagreed with the decision in *Statler Trust, supra.* We granted the executors' petition for certiorari, 435 U. S. 922 (1978).

In this Court, as in the courts below, the parties agree on the method of calculating the normal tax but sharply disagree in regard to the proper computation of the alternative tax under § 1201 (b). To illustrate, the normal tax for 1967 amounted to $88,000 in round figures.[5] According to the

---

[5] The agreed method for computing the normal tax may be illustrated by utilizing the 1967 figures, rounded off:

Normal tax

| | |
|---|---:|
| Estate gross income, including long-term capital gain of $500,000 | $595,000 |
| Less: § 1202 deduction (50% of $500,000 net long-term capital gain) | (250,000) |
| Charitable deduction (remaining 50% of $225,000 charitable set-aside, plus $32,500 attributable to short-term capital gain and ordinary income set aside for charitable legatees) | (145,000) |
| Miscellaneous deductions | (54,000) |
| Estate taxable income | 146,000 |
| Tax (at normal rates) | $88,000 |

executors, the alternative tax was $70,800,[6] which, being a lesser amount than the normal tax, would be the amount due. The Government calculates the alternative tax to be $125,000 and thus insists that the normal tax in the amount of $88,000 was properly payable.[7] As we have indicated, resolution of the issue turns on whether the net long-term gain to which the

---

[6] The executors' application of § 1201 (b) to income for 1967 approximated the following:

Alternative tax

| | |
|---|---:|
| Estate taxable income | $146,000 |
| Less: 50% reduction of net long-term capital gain under § 1201 (b) (1) | (137,500) |
| The executors reduced the long-term capital gain of $500,000 by the 45% paid to charity (or $225,000), leaving a balance of $275,000 (50% of $275,000=$137,500) | |
| Partial taxable income | 8,500 |
| Tax (at normal rates) on partial taxable income | 1,800 |
| Plus: tax on long-term capital gain (25% of $275,000) under § 1201 (b) (2) | 69,000 |
| Total tax | $70,800 |

[7] The Government's computation, using approximate 1967 figures, was as follows:

Alternative tax

| | |
|---|---:|
| Estate taxable income | $146,000 |
| Less: 50% reduction of net long-term capital gain under § 1201 (b) (1) | (250,000) |
| The capital-gain figure employed reflects the entire $500,000 of long-term capital gain unreduced by the amounts set aside for charity | |
| Partial taxable income | –0– |
| Tax (at normal rates) on partial taxable income | –0– |
| Plus: tax on long-term capital gain (25% of $500,000) under § 1201 (b) (2) | 125,000 |
| Total tax | $125,000 |

alternative tax is applicable is permissibly reducible by the amount of the charitable set-asides in the years in question. On this score, we agree with the executors and reverse the Court of Appeals.

## II

The Government's position rests on what it deems to be the plain language of § 1201 (b), which directs that the "excess of the net long-term capital gain over the net short-term capital loss" be taxed. This language, it is said, unambiguously embraces income distributed to or set aside for charitable beneficiaries, even though in their hands the same income would be tax exempt.

The difficulty with the Government's position is that § 1201 (b) is not always understood to mean what it seems to say. The Government concedes here that if 45% of the net long-term gain had been distributable to taxable beneficiaries rather than to charity, the net long-term gain subject to the § 1201 (b) alternative tax would have been reduced to the extent of the noncharitable distribution, despite the failure of the section's language to provide for this treatment. In that event, the alternative tax would have been $70,800, precisely the amount due by the executors' computation where the 45% distribution or set-aside is for charitable purposes. Thus, it cannot be said that § 1201 (b) *never* permits reduction of the total net long-term capital gain in response to imperatives emerging from other sections of the Code.[8]

---

[8] The alternative tax has been applied flexibly in another context to effectuate a clear congressional policy facially inconsistent with the language of § 1201. It has been held that the income tax deduction permitted by 26 U. S. C. § 691 (c) for the amount of estate tax attributable to income in respect of a decedent can be offset against the estate's capital gains before application of the alternative tax. The deduction was thought necessary to honor the congressional purpose animating the § 691 (c) deduction of avoiding imposition of both estate and income taxes on sums included in an estate as income in respect of a decedent. See, e. g., *Read* v. *United States,* 320 F. 2d 550 (CA5 1963); *Meissner* v.

The Government explains its application of § 1201 (b) to capital gains distributable to noncharitable beneficiaries by noting that the Internal Revenue Code of 1954 manifests a general pattern of treating estates and trusts as conduits for distributable income. Accordingly, although estates are taxable entities, their distributable income is taxable to the beneficiaries rather than to the estates. Hence, to avoid assessing taxes against both the estate and its beneficiaries, the amounts includable in the beneficiaries' gross income are excluded in computing the estate's alternative tax. Sections 661 (a) and 662 (a) are the sections said to implement this end.[9] Section 661 (a) permits an estate or trust to deduct

_United States,_ 176 Ct. Cl. 684, 364 F. 2d 409 (1966); _Estate of Sidles_ v. _Commissioner,_ 65 T. C. 873 (1976), acq. 1976–2 Cum. Bull. 2.

[9] Title 26 U. S. C. § 661 (a) (1964 ed.) states:

"(a) Deduction.

"In any taxable year there shall be allowed as a deduction in computing the taxable income of an estate or trust (other than a trust to which subpart B applies), the sum of—

"(1) any amount of income for such taxable year required to be distributed currently (including any amount required to be distributed which may be paid out of income or corpus to the extent such amount is paid out of income for such taxable year); and

"(2) any other amounts properly paid or credited or required to be distributed for such taxable year;

"but such deduction shall not exceed the distributable net income of the estate or trust."

Title 26 U. S. C. § 662 (a) (1964 ed.) provides:

"(a) Inclusion.

"Subject to subsection (b), there shall be included in the gross income of a beneficiary to whom an amount specified in section 661 (a) is paid, credited, or required to be distributed (by an estate or trust described in section 661), the sum of the following amounts:

"(1) Amounts required to be distributed currently.

"The amount of income for the taxable year required to be distributed currently to such beneficiary, whether distributed or not. If the amount of income required to be distributed currently to all beneficiaries exceeds the distributable net income (computed without the deduction allowed

from its gross income any income required to be distributed
currently and any other amount properly paid or credited or
required to be distributed for the taxable year. Section 662
(a) in turn essentially directs a beneficiary to include in its
gross income amounts described in § 661 (a).[10]

by section 642 (c), relating to deduction for charitable, etc., purposes) of
the estate or trust, then, in lieu of the amount provided in the preceding
sentence, there shall be included in the gross income of the beneficiary an
amount which bears the same ratio to distributable net income (as so
computed) as the amount of income required to be distributed currently
to such beneficiary bears to the amount required to be distributed cur-
rently to all beneficiaries. For purposes of this section, the phrase 'the
amount of income for the taxable year required to be distributed cur-
rently' includes any amount required to be paid out of income or corpus
to the extent such amount is paid out of income for such taxable year.
"(2) Other amounts distributed.
"All other amounts properly paid, credited, or required to be distributed
to such beneficiary for the taxable year. If the sum of—
"(A) the amount of income for the taxable year required to be dis-
tributed currently to all beneficiaries, and
"(B) all other amounts properly paid, credited, or required to be dis-
tributed to all beneficiaries
"exceeds the distributable net income of the estate or trust, then, in lieu
of the amount provided in the preceding sentence, there shall be included
in the gross income of the beneficiary an amount which bears the same
ratio to distributable net income (reduced by the amounts specified in
(A)) as the other amounts properly paid, credited or required to be dis-
tributed to the beneficiary bear to the other amounts properly paid,
credited, or required to be distributed to all beneficiaries."
[10] The amount deductible by the estate under § 661 (a) and includ-
able in the gross income of the beneficiaries under § 662 (a) is generally
limited by "distributable net income," defined in 26 U. S. C. § 643 (a)
(1964 ed.) as taxable income computed with certain modifications. One
such modification is the exclusion of "[g]ains from the sale or exchange
of capital assets . . . to the extent that such gains are allocated to corpus
and are not (A) paid, credited, or required to be distributed to any
beneficiary during the taxable year, or (B) paid, permanently set aside,
or to be used for the purposes specified in section 642 (c)." § 643 (a) (3).
Section 643 (a) (3) has been variously interpreted by the Second and

We agree that these provisions of the Code provide a sound justification for treating income distributable to taxable beneficiaries as belonging to them rather than to the estate and

Ninth Circuits and by the parties in the course of this litigation. The Second Circuit in *Statler Trust* considered capital gains set aside for charity to be "inclu[ded] in the definition of distributable net income in § 643 (a)(3)," 361 F. 2d, at 131, hence indicating conduit treatment for such set-asides. The court below announced a more expansive view. It implied that all "[a]mounts distributed or set aside to charity . . . remain in distributable net income," whether consisting of capital gain or ordinary income. 563 F. 2d, at 404. This construction was thought supportive of the Government's position on the theory that " 'conduit' treatment [for charitable set-asides] would suggest that amounts distributed or set aside for charity would be *excluded* from . . . distributable net income." *Ibid.* (emphasis in original).

The executors have insisted all along that the total amount of income constituting distributable net income as defined by § 643 (a)(3) does not include charitable distributions or set-asides whether consisting of capital gain or not. In the executors' view, though § 643 (a)(3) directs that taxable income be modified by excluding capital gains paid to principal *except* for income allocable to charity or possessing other specified characteristics, charitable set-asides are independently extracted from taxable income by virtue of the § 642 (c) deduction. The Government, unlike the court below, has never suggested that charitable set-asides consisting of ordinary income are included in total distributable net income. But the construction developed in the Government's brief before this Court was that amounts deemed distributable to taxable beneficiaries do include *capital gains* added to residue but set aside for an exempt organization. The executors argued in reply, however, that computation of distributable net income pursuant to the Government's formal instructions for the years in question produced a figure equal to the amount of an estate's income exclusive of capital gains set aside for charity. At oral argument, the Government appeared to have changed its mind and to be conceding that its initial view and the more far-reaching construction of the Court of Appeals were in error:

"[F]or purposes of this argument we would be willing to concede that the taxpayers' version of the computation of distributable net income and its [*sic*] attack on the example which we set out in our brief is correct.

"But we do submit that that is just utterly irrelevant. You come to the question of distributable net income only after you have arrived at taxable

hence for reducing the net long-term gain to be taxed to the estate under § 1201 (b) by the amount of gain distributable and taxable to the beneficiary. We also agree, as do the executors, that because § 663 [11] provides expressly that amounts qualifying as charitable deductions under § 642 (c) "shall not be included as amounts falling within section 661 (a) or 662 (a)," charitable distributions or set-asides are not within the conduit system applicable to noncharitable beneficiaries. We reject the Government's view, however, that this explanation for the application of § 1201 to taxable distributions of capital-gains income also negates similar treatment for amounts of current income that are distributed to, or permanently set aside for, charitable beneficiaries and that are deductible by the estate under § 642 (c). Indeed, the latter section serves to extract income destined for charitable entities from the taxable income of the estate and thus supplies a conduit for charitable contributions similar to that provided by §§ 661 (a) and 662 (a) in regard to income passing to taxable distributees. The express exclusion from §§ 661 (a) and

income [which] has been diminished by that part of a charitable deduction or that part of a set aside for charity which comes out of gross income.

"And it is only at that point . . . that . . . distributable net income adjustments become relevant." Tr. of Oral Arg. 35–36.

We need not attempt to resolve this contrariety of views, for we agree with the Government that the nature and function of distributable net income have little or nothing to do with the treatment of charitable set-asides under § 1201 (b).

[11] Title 26 U. S. C. § 663 (a) (2) (1964 ed.) provides:

"(a) Exclusions.

"There shall not be included as amounts falling within section 661 (a) or 662 (a)—

. . . . .

"(2) Charitable, etc., distributions.

"Any amount paid or permanently set aside or otherwise qualifying for the deduction provided in section 642 (c) (computed without regard to section 681)."

662 (a) of those amounts deductible under § 642 (c) in no way refutes conduit treatment of such amounts. Rather, the exclusion pursuant to § 663 prevents a second deduction for charitable set-asides and recognizes as well that they are accorded separate treatment elsewhere under the Code.[12]

The Government makes much of § 1202's directive to *exclude* capital gains distributable to taxable beneficiaries in computing the capital-gains deduction, and of the absence of a similar mandate with respect to charitable distributions or set-asides, which are only subject to a *deduction* under § 642 (c). Hence, it is argued, income distributions to charity are not to be considered the property of the beneficiary in the same sense as income passing to taxable entities is attributed to the distributees. We doubt that so much should turn on § 1202.[13] The provision having the operative role in removing

---

[12] The legislative history of the 1954 Code makes plain that capital gains passing to charity were not encompassed by §§ 661 (a) and 662 (a)—which ensure conduit treatment of capital gains distributable to taxable beneficiaries—because income paid or set aside for charitable purposes was already immunized from taxation by § 642 (c). The House Committee explained that "[s]ince the estate or trust is allowed a deduction under section 642 (c) for these amounts, they are not allowed as an additional deduction for distributions nor are they treated as amounts distributed for purposes of section 662 in determining the amounts includible in the gross income of the beneficiaries." H. R. Rep. No. 1337, 83d Cong., 2d Sess., A205 (1954); accord, S. Rep. No. 1622, 83d Cong., 2d Sess., 354 (1954).

[13] Section 1202 is far less supportive of the Government's position than the dissent would indicate. Our dissenting colleagues contend that, in excluding capital gains distributable to taxable beneficiaries from the computation of the capital-gains deduction, § 1202 authorizes a modification of the meaning of "excess" of the net long-term capital gain over net short-term capital loss for purposes of § 1201 as well as § 1202. The modification must be extended to § 1201, according to the dissent, in order to preserve the scheme of the alternative tax. More specifically, half of the "excess" is deducted under § 1202, and the other half is deducted pursuant to the first step of § 1201; thus, to ensure that 100% of the excess-is deducted by operation of both provisions, the term "excess" must be construed similarly for purposes of both sections. The same mandate

the noncharitable distribution from the estate income is § 661 (a), and that section unmistakably provides a *deduction* for such sums, just as § 642 (c) permits *deductions* for distributions to nontaxable entities.

Nor do we agree that charitable and noncharitable distributions of long-term gain should be regarded differently because in the one case the distribution is taxable in the hands of the beneficiary and in the other it is tax free. Indeed, it is arguable that the reduction of the gain taxable under § 1201 (b) is even more justified when the income distribution is not only

---

is assertedly absent with regard to income passing to charity. See *post,* at 208–209.

The dissenters' thesis, however, at most explains why the first step of § 1201 should be computed by excluding capital gains distributable to taxable beneficiaries. It provides no basis for removing such gains from the "excess" subject to the 25% flat rate under the second step of § 1201. Yet our dissenting Brethren agree that § 1201 (b) (2)—the second stage of the alternative tax—should not be literally construed to make capital gains passing to taxable beneficiaries taxable to the estate. The real reason is not to preserve consistency in abstract form, as the dissent's definitional argument misleadingly suggests, but to maintain loyalty to conduit principles as manifested by §§ 661 (a) and 662 (a) in the context of capital gains distributable to taxable beneficiaries. See *post,* at 209.

Moreover, the absence of an exclusionary clause in § 1202 respecting capital gains distributable to charity is readily explainable in a fashion consistent with our position. The clause operates to prevent the estate from deducting under § 1202 50% of all capital gains distributable to taxable beneficiaries and then deducting an amount equal to 100% of such gains under § 661 (a). A redundant deduction is precluded in the context of gains passing to charity by a different, but equally effective, method. Specifically, the charitable counterpart of § 661 (a)—§ 642 (c)—expressly contemplates an adjustment for deductions already taken under § 1202. In that way, § 642 (c) ensures that no more, but certainly no less, than the entire amount of gains passing to charity will be exempt from taxation under the normal tax. In substance, then, capital gains distributable to both taxable and nontaxable beneficiaries are removed from income taxable to the estate by the normal method. Nothing our Brethren say warrants similar treatment for the former but not the latter under § 1201. See also n. 14, *infra.*

deductible from estate income but also looked upon with such favor that it is not taxable at all in the hands of the distributee.[14] Furthermore, distributions of income to taxable beneficiaries retain the same character in their hands as they had in the hands of the estate. 26 U. S. C. § 662 (b) (1964 ed.). If such distributions are wholly or partly composed of capital gain, the distributee treats them as such in his own return. He is entitled to offset the gain with his own capital losses that accrued in other transactions having nothing to do with the estate. He may, therefore, suffer no tax at all on the gain. Nevertheless, and even though the estate would have paid a tax on the capital gain had it not been distributable, the estate's net long-term capital gain for § 1201 (b) purposes would be reduced by the amount of the distribution. The executors' position, with which we agree, is that a similar reduction of the net long-term gain taxable under § 1201 should not be denied simply because the beneficiary is a charity that will pay no tax on the gain set aside for it.

As the Government and the Court of Appeals construe the Internal Revenue Code, the estate in this case, which set aside part of its capital gain for charity, must pay a higher income tax than if the same portion of capital gain had been distributed to a taxable beneficiary. Because the tax will inevitably reduce the residue, the burden of the extra tax will be borne either by the charities themselves or by noncharitable residual

---

[14] The dissent suggests, however, that charitable and noncharitable distributions should be treated differently because the congressional policy against double taxation is implicated in the latter context but not the former. See post, at 209–210. But in exempting charitable entities from tax liability Congress manifested a purpose to insulate all income contributed to charity from taxation. Taxing income en route to charity while temporarily in the possession of an estate is as inconsistent with the congressional policy to exempt such income from federal taxation altogether as taxing other income twice is inconsistent with the congressional policy to tax such income once.

legatees. We doubt that Congress intended either result. The former allocation would contravene the statutory provision for the deduction of charitable set-asides—§ 642 (c) provides for their deductibility "without limitation"—and would indirectly offend the exemption extended to charities by § 501. Allocating the burden to the noncharitable legatees would result in taxation of the capital gain accruing to their benefit at an effective rate higher than the 25% ceiling that § 1201 was intended to impose on the taxation of net long-term capital gain. If all of the net long-term capital gain in this case had been added to corpus and none distributed to or set aside for charity, there is no doubt that the estate's alternative tax would have been lower than its normal tax and the tax on its net gain would have been limited to 25%. We cannot agree that the estate is not to have the full benefit of the 25% ceiling simply because part of its gain is set aside for a tax-exempt entity.

## III

In support of its position, the Government presents an interesting history of the income taxation of capital gains. The central submission of this exegesis is that in 1924 taxpayers were permitted to deduct the excess of ordinary deductions over ordinary income from capital gains subject to an alternative tax otherwise resembling § 1201, see Revenue Act of 1924, § 208 (a)(5), 43 Stat. 262, but that in 1938, when the alternative tax in its present form emerged, no allowance was made for reduction of the gain subject to the alternative tax by ordinary losses, see Revenue Act of 1938, § 117 (c)(1), 52 Stat. 501. This development is interpreted by the Government—mistakenly we think—as a deliberate rejection of the computational method advocated by the executors.

The issue here is not whether an excess of deductions over ordinary income may serve generally to reduce the gain subject to the alternative tax; rather, the inquiry concerns whether there is income properly attributable to the charitable

beneficiary that should not be taxed to the estate at all. Assuredly, had all of the capital gain been set aside for charity and had there been no other estate income, there would have been no tax at all; the § 642 charitable deduction would have negated the entire capital-gains income of the estate, thus subjecting no taxable income whatsoever to the normal tax. Equally clear is that when 45% of the capital gain is set aside for a charitable entity, the gain subject to the normal tax is reduced to that extent. The Government does not dispute that the net effect of this § 1202 computation is to recognize the entire amount set aside for the exempt organization. The executors now ask no more than full recognition of the conduit principle in the computation of the alternative tax. The legislative history on which the Government relies is not at all incompatible with the general applicability of the conduit concept. In fact, the legislative history of the 1954 Code makes plain that Congress sought rigorously to adhere "to the conduit theory of the existing law[, which] means that an estate or trust is in general treated as a conduit through which income passes to the beneficiary." H. R. Rep. No. 1337, 83d Cong., 2d Sess., 61 (1954).[15]

---

[15] In the same vein the Senate Committee explained that "[y]our committee's bill contains the basic principles of existing law under which estates and trusts are treated as separate taxable entities, but are generally regarded as conduits through which income passes to the beneficiary." S. Rep. No. 1622, 83d Cong., 2d Sess., 82 (1954). Capital gains were to be taxable "to the estate or trust [only] where the gains must be or are added to principal," id., at 343. See also H. R. Rep. No. 1337, 83d Cong., 2d Sess., A194–A195 (1954); H. R. Conf. Rep. No. 2543, 83d Cong., 2d Sess., 54 (1954), excepting amounts paid, credited, or required to be distributed to any beneficiary in the taxable year or "paid, permanently set aside, or to be used for the purposes specified in section 642 (c)." Ibid. See also H. R. Rep. No. 1337, supra, at A194–A195; S. Rep. No. 1622, supra, at 343–344. This legislative history confirms our understanding of the statutory text as manifesting conduit treatment of capital gains passing to taxable and nontaxable beneficiaries alike.

## IV

The Government asserts nonetheless that a ruling favoring the executors would run counter to the Court's decision in *United States* v. *Foster Lumber Co.*, 429 U. S. 32 (1976), rendered two Terms ago. That case involved § 172 of the Internal Revenue Code of 1954, 26 U. S. C. § 172 (1964 ed.), which provided that a net operating loss incurred by a corporate taxpayer in one year may be carried as a deduction against taxable income for preceding years. The issue was whether a loss was absorbed by capital gain in addition to ordinary income in the year to which it was first carried, or whether it was limited to offsetting only ordinary income. Section 172 in terms provided that, when a loss had been carried back to the first available year, it survived for carryover to subsequent periods only to the extent that it exceeded the taxable income of the earlier year. Because taxable income was defined generally in the Code to include both capital gain and ordinary income, the Court concluded that a loss carryback must be applied to the sum of the two.

The taxpayer in *Foster Lumber* never disputed that losses in carryover years could not be deducted from capital gain in executing the second step of the alternative tax.[16]  In fact, because of that limitation, the taxpayer insisted that loss carrybacks should not be treated as absorbed by capital gains for purposes of § 172.  Otherwise, in utilizing the alternative tax, the taxpayer would lose the benefit of that portion of the loss corresponding to capital gain.  In rejecting the taxpayer's contention, the Court noted that relevant legislative history belied any notion of a congressional intention to ameliorate all "wastage" of loss deductions.  It was able to conclude that "Congress has not hesitated in this area to limit taxpayers to

---

[16] The alternative tax involved in *Foster Lumber* was set forth in 26 U. S. C. § 1201 (a) (1964 ed.), which was the corporate counterpart of § 1201 (b), the provision directly involved herein.

the enjoyment of one tax benefit even though it could have made them eligible for two." 429 U. S., at 46.

The Government maintains that the executors' construction of the alternative tax conflicts with our assessment of its operation in *Foster Lumber*. The executors, in the Government's view, are no more entitled to exclude charitable set-asides in computing the second component of the alternative tax than was the taxpayer in *Foster Lumber* able to subtract excess ordinary deductions. But the construction of the alternative tax accepted by both parties in *Foster Lumber,* and assumed valid by this Court, merely accorded recognition to decisions discerning a congressional refusal—evidenced by the legislative history discussed in Part III, *supra*—to permit subtraction of ordinary losses from capital gains in the application of § 1201.[17] The executors do not deny that a taxpayer cannot reduce capital gains by the amount of ordinary losses in figuring the alternative tax, but argue that capital gains set aside for charity are not taxable to an *estate* to begin with. The Government acknowledges that there is ample support in the provisions of Subchapter J for reducing the estate's net long-term capital gain by amounts distributable to taxable beneficiaries, and that *Foster Lumber* is thus dis-

---

[17] See, *e. g., Weil* v. *Commissioner,* 23 T. C. 424 (1954), aff'd, 229 F. 2d 593 (CA6 1956). There, the taxpayers' total deduction, which included charitable deductions, exceeded their ordinary income, and they sought to utilize this excess to reduce the amount of their capital gains before applying the 25% tax available under § 1201 (b). The claim was rejected because there was no basis in § 1201 or other provisions of the Code for reducing net long-term capital gains by both the net short-term losses and by the excess of ordinary deductions over ordinary income and because pertinent legislative history contradicted the taxpayers' construction. See Part III, *supra.* The court in the *Weil* case, however, had no occasion to consider whether the net long-term gain belonging to a charitable income beneficiary of an estate may be excluded by the estate in computing the alternative tax. See *Chartier Real Estate Co.* v. *Commissioner,* 52 T. C. 346, 355 (1969), aff'd, 428 F. 2d 474 (CA1 1970).

tinguishable in that context. We believe the decision is similarly inapposite when charitable beneficiaries are involved.[18]

We think, then, that the Court of Appeals for the Second Circuit arrived at the correct result in the *Statler Trust* case. The court there recognized what this Court had earlier said: that currently distributable income is not treated "as the [estate's] income, but as the beneficiary's," whose "share of the income is considered his property from the moment of its receipt by the estate." *Freuler* v. *Helvering*, 291 U. S. 35, 41–42 (1934). That principle survived in substance in the 1954 Code; and to treat differently charitable and noncharitable distributions of capital gain for the purpose of computing the alternative tax under § 1201 (b) "stresses the form at the neglect of substance." *Statler Trust* v. *Commissioner*, 361 F. 2d, at 131. We agree with the Second Circuit that "the letter of § 1201 (b) must yield when it would lead to an unfair and unintended result." *Ibid.*

---

[18] It is notable, too, that the executors do not endeavor to pyramid the tax advantages associated with charitable income and capital gains in the face of a discernible congressional intention to "limit taxpayers to the enjoyment of one tax benefit." *United States* v. *Foster Lumber Co.*, 429 U. S., at 46. Indeed, it seems to us that the Government's construction itself yields cumulative tax benefits that Congress very likely never intended. According to the Government, § 1201 (b) (1) compels the reduction of the taxable income figure computed under § 1202 by "an amount equal to 50 percent" of the total "excess" of net long-term capital loss rather than by 50% of the long-term gain not set aside for charity. Although not the case here, in other circumstances the deduction afforded by the Government's construction of § 1201 (b) (1) with its diminution of the partial tax may more than offset the higher tax resulting from the Government's computation under § 1201 (b) (2) and may yield an alternative tax lower than the tax resulting from the executors' approach and thus lower than that which would ensue if income moving to charity had never been held by the estate.

The contingency may be demonstrated by a hypothetical example. Assuming an effective tax rate on ordinary net income of 60% and estate receipts of $125,000 in ordinary income and $500,000 in long-term capital gains, with one-half of the capital gains allocable to a charitable benefi-

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

MR. JUSTICE STEVENS, with whom MR. JUSTICE STEWART and MR. JUSTICE REHNQUIST join, dissenting.

Section 1202 of the Internal Revenue Code describes the "normal" method of computing the tax on a long-term capital

---

ciary, the parties would compute the normal tax and the alternative tax as follows:

Normal tax

| | |
|---|---:|
| Gross income | $625,000 |
| Less: § 1202 deduction | (250,000) |
| § 642 (c) deduction | (125,000) |
| Taxable income | 250,000 |
| Tax (at 60% rate) | $150,000 |

Alternative tax, per executors' method

| | |
|---|---:|
| Estate taxable income | $250,000 |
| Less: 50% of that portion of long-term capital gain not set aside for charity (50% of $250,000) | (125,000) |
| Partial taxable income | 125,000 |
| Partial tax (60% effective rate) | 75,000 |
| Tax on long-term capital gain not set aside for charity (25% of $250,000) | 62,500 |
| Total alternative tax | $137,500 |

Alternative tax, per Government's method

| | |
|---|---:|
| Estate taxable income | $250,000 |
| Less: 50% of all the excess of net long-term capital gain over net short-term capital loss (50% of $500,000) | (250,000) |
| Partial taxable income | –0– |
| Partial tax | –0– |
| Tax on all net long-term capital gain (25% of $500,000) | 125,000 |
| Total alternative tax | $125,000 |

Significantly, the executors do not complain that the redundant deduction available under the Government's computational method would be "wasted" were ordinary income inadequate to absorb it. Quite to the

gain.[1]  Section 1201 describes the "alternative" method which must be used if it produces a lesser tax than the § 1202 computation.[2]  Under the "normal" method, one-half of the gain is deducted and the other half is included in taxable income and taxed at ordinary graduated rates.  If a taxpayer's income places him in a high enough tax bracket, the rate of tax under the normal method may exceed 25%.  The "alternative" method prescribed by § 1201 protects the high-bracket taxpayer from this risk by imposing a flat 25% tax on the total capital gain and limiting the application of the graduated rates to the remainder of his income.

---

contrary, it is their position that the cumulative deduction would never be afforded under conduit treatment of capital gains en route to charity.

[1] "§ 1202.  Deduction for capital gains.

"In the case of a taxpayer other than a corporation, if for any taxable year the net long-term capital gain exceeds the net short-term capital loss, 50 percent of the amount of such excess shall be a deduction from gross income.  In the case of an estate or trust, the deduction shall be computed by excluding the portion (if any), of the gains for the taxable year from sales or exchanges of capital assets, which, under sections 652 and 662 (relating to inclusions of amounts in gross income of beneficiaries of trusts), is includible by the income beneficiaries as gain derived from the sale or exchange of capital assets."  26 U. S. C. § 1202 (1964 ed.).

[2] Section 1201 (b) provides:

"Other taxpayers.

"If for any taxable year the net long-term capital gain of any taxpayer (other than a corporation) exceeds the net short-term capital loss, then, in lieu of the tax imposed by sections 1 and 511, there is hereby imposed a tax (if such tax is less than the tax imposed by such sections) which shall consist of the sum of—

"(1) a partial tax computed on the taxable income reduced by an amount equal to 50 percent of such excess, at the rate and in the manner as if this subsection had not been enacted, and

"(2) an amount equal to 25 percent of the excess of the net long-term capital gain over the net short-term capital loss."  26 U. S. C. § 1201 (b) (1964 ed.).

The "alternative" method for corporate taxpayers is specified in 26 U. S. C. § 1201 (a) (1964 ed.).

The alternative method was expressly designed to provide a limited benefit for a limited class of taxpayers. That class includes individuals, corporations, and fiduciaries. The statutory language used to describe the precise scope of the benefit is clear and has been consistently applied to corporate and individual taxpayers for decades. The question presented by this case is whether a departure from the plain meaning of the statute should be adopted for the special benefit of fiduciaries in the high tax brackets.

The Court does not squarely address that question. Instead it regards the controlling question as whether there is any justification for a distinction between distributions by a fiduciary to taxable beneficiaries and such distributions to nontaxable beneficiaries. In my judgment both questions should be answered by adhering to the language used by Congress to define taxpayers' responsibilities. The language requires both fiduciaries and nonfiduciaries to use the same methods of computing their capital-gains taxes, but draws a sharp distinction between distributions by fiduciaries to taxable beneficiaries and such distributions to charity.

I

The controversy in this case centers around the meaning of the word "excess." The term is used both in § 1202's description of the "normal" tax and in § 1201's description of the "alternative" tax. In both sections "excess" is defined to mean the amount by which, in any year, the taxpayer's "net long-term capital gain exceeds the net short-term capital loss." The Government takes the straightforward position that "excess" means exactly what the statute says—the difference between the taxpayer's net long-term capital gain and his net short-term capital loss—and that this meaning is exactly the same in both the normal and the alternative tax computations.

With respect to § 1202's normal method, the petitioners do not challenge the Government's interpretation or the final tax

that it produces. Both parties agree that the dollar value of the statutory term "excess" as used in the normal calculation of petitioners' 1967 income tax is $500,000.[3] On their return petitioners recognized that the § 1202 capital-gains deduction of "50 percent of the amount of such excess," was $250,000, or half of the total net long-term capital gain of $500,000.[4] In computing the § 1202 deduction petitioners did not even suggest that this excess should have first been reduced by the portion set aside for charity.[5]

---

[3] The dollar value of the statutory term "excess" is reflected twice in the normal tax calculation. Taking the rounded-off figures from petitioners' 1967 return, set forth *ante*, at 185 n. 5 of the Court's opinion, the estate's 1967 gross income of $595,000 included net long-term capital gain of $500,000. As the first step in the calculation of its normal tax, the taxpayer is allowed a deduction of "50 percent of the amount of *such excess*" or $250,000. 26 U. S. C. § 1202 (1964 ed.) (emphasis added). In the next step, the charitable deduction is taken: Under § 642 (c) of the Code, an adjustment in the charitable deduction is required to reflect the fact that half of the contribution out of long-term capital gains has already been included in the § 1202 "deduction for excess of capital gains over capital losses." This required adjustment yields a net charitable deduction of $112,500 rather than the total amount of $225,000 actually set aside for charity. After subtracting all other miscellaneous deductions, the estate shows a taxable income of $146,000 subject to tax, at normal rates, of $88,000.

[4] Because the estate incurred no short-term or long-term capital losses in 1967 and 1968, I sometimes refer simply to "net long-term capital gain" or "capital gain."

[5] They recognized as well that for purposes of the § 642 (c) adjustment to the charitable deduction, "the excess of capital gains over capital losses" referred to the total excess, without any prior reduction for charitable contributions. Section 642 (c), with emphasis added to the portion relevant to this discussion, provides:

"§ 642. Special rules for credits and deductions.

"(c) Deduction for amounts paid or permanently set aside for a charitable purpose.

"In the case of an estate or trust (other than a trust meeting the specifications of subpart B) there shall be allowed as a deduction in com-

It is with respect to the alternative method that the petitioners and the Government part company on the meaning of the term "excess." The § 1201 alternative calculation is actually a sequel to § 1202's normal calculation which provides a deduction of 50% of the "excess." In the alternative calculation the taxpayer deducts the second half of the "excess" from his ordinary income and computes a partial tax on the income remaining after the entire "excess" has been excluded; then he computes the alternative tax on the entire capital gain, or excess, at a 25% rate.

Using 1967 as an example, see *ante*, at 186, nn. 6 and 7, under the Government's view, not only the first 50% of the excess deducted pursuant to § 1202 but also the second 50% deducted pursuant to § 1201 (b)(1) amounts to $250,000. This consistency effects an exclusion of the entire $500,000 capital gain from the calculation of the partial tax. Petitioners, however, make what I regard as the astounding contention that even though the first half of the excess calculated under § 1202 amounted to $250,000, the second half

puting its taxable income (in lieu of the deductions allowed by section 170 (a), relating to deduction for charitable, etc., contributions and gifts) any amount of the gross income, without limitation, which pursuant to the terms of the governing instrument is, during the taxable year, paid or permanently set aside for a purpose specified in section 170 (c), or is to be used exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, or for the establishment, acquisition, maintenance or operation of a public cemetery not operated for profit. *For this purpose, to the extent that such amount consists of gain from the sale or exchange of capital assets held for more than 6 months, proper adjustment of the deduction otherwise allowable under this subsection shall be made for any deduction allowable to the estate or trust under section 1202 (relating to deduction for excess of capital gains over capital losses).* In the case of a trust, the deduction allowed by this subsection shall be subject to section 681 (relating to unrelated business income and prohibited transactions)." 26 U. S. C. § 642 (c) (1964 ed.) (emphasis added).

calculated under § 1201 amounted to only $137,500.[6] Petitioners obtained this latter figure by treating the term "excess" in § 1201 as the amount remaining after 45% had been set aside for charity.[7]

In my judgment, there is simply no basis for accepting petitioners' argument that "excess" means one thing when used in § 1202 and quite another when used in § 1201. Nor is there any basis for rewriting the statutory definition of "excess" in either section in order to reduce the amount by which "net long-term capital gain exceeds the net short-term capital loss" by the portion of the capital gains set aside for charity. No rewriting is necessary in order to fulfill the purpose of the statute. For the Government's reading is consistent with both the plain meaning and the underlying purpose of the statutory provision. The Government's view allows every taxpayer either to include 50% of his capital gain in ordinary income and to take a charitable deduction under § 642 or, alternatively, to exclude the entire capital gain from the portion of his income which is taxed at ordinary rates (after charitable and other deductions have been taken) and to pay the 25% tax on the entire capital gain.

To be sure, in situations like this it may be to the taxpayer's advantage in calculating his alternative tax to take the char-

---

[6] The Court makes the equally astonishing suggestion that even if the relationship between § 1202 and the first step in the § 1201 calculation requires that "excess" be given the same meaning, that word may nevertheless be given a different meaning in the second step of the § 1201 calculation. See *ante*, at 192–193, n. 13. This suggestion is no more tenable than the taxpayer's argument and would produce a different tax than the Court approves today.

[7] Although the exclusion of $137,500 instead of $250,000 produces a higher partial tax than a consistent interpretation of the word "excess," this gambit is rewarded by the second step of the alternative calculation. Section 1201 (b) (2) imposes a flat 25% tax on the excess of the net long-term capital gain over the net short-term capital loss: Under the Government's view, this amounts to $125,000 (25% of $500,000) whereas under petitioner's view the capital gains tax is only $68,750 (25% of $275,000).

itable deduction, not against ordinary income subject to the partial tax, but rather against capital-gain income subject to the flat 25% tax rate. The advantage petitioners seek would avoid "wasting" a portion of the charitable deductions. But the fiduciary taxpayer is not alone in facing this risk as a result of the Government's interpretation. Individual and corporate taxpayers may similarly find that a portion of their charitable deductions are "wasted" in the calculation of the alternative tax. Nor do fiduciaries have any special interest in the policy of encouraging charitable contributions; from the point of view of the charity which receives the contributions, it does not matter whether the donor is an individual, a corporation, or a fiduciary.

Nonetheless, it is established and accepted that individual and corporate taxpayers are not free to calculate their alternative taxes in the manner which the Court today holds is acceptable for fiduciary taxpayers. While the Revenue Act of 1924 did in certain circumstances authorize the use of ordinary deductions to reduce the amount of capital gains,[8] that aspect of the law was changed in 1938.[9] Ever since that time, the

---

[8] Section 208 (a)(5) of the Revenue Act of 1924 provided:

"The term 'capital net gain' means the excess of the total amount of capital gain over the sum of (A) the capital deductions and capital losses, plus (B) the amount, if any, by which the ordinary deductions exceed the gross income computed without including capital gain." 43 Stat. 262.

[9] "The 1938 Revenue Act combined the percentage concept of the then existing law with the alternative tax principles of the revenue acts in effect prior to the 1934 Act. Except for changes immaterial to the issue in the instant case, the provisions of the 1938 Act and the 1939 Code in effect for 1948 are substantially the same. Compare sections 117 (b) and 117(c)(1) of the 1938 Act with sections 117 (b) and 117 (c)(2) of the 1939 Code as amended. The effect of section 117 of the 1938 Act, as intended by the Congress which first enacted it, was to place an upper limit on the amount of tax levied upon capital gain. See S. Rept. No. 1567, 75th Cong., at p. 20, reported in 1939-1 C. B. (Part 2) 779, 794. The 1938 Act thus provided that the taxable portion of such gain is either added to the taxpayer's other gross income and taxed in

Government's interpretation of the capital-gains tax computation has been applied consistently to individual and corporate taxpayers to deny them the benefit which petitioners today are granted.[10]

In upholding the Government's interpretation of the alternative tax calculation with respect to an individual taxpayer, the Tax Court observed:

"We agree with petitioners that respondent's determination renders ineffective a part of their charitable contributions. We repeat, however, that the alternative tax is imposed only if it is less than the tax computed under the regular method which permits deduction of the total contributions in the instant case." [11]

That observation is equally relevant to this case. That the "alternative" method, as computed by the Government, results in a greater total tax than the "normal" method means only that the taxpayer must pay the "normal" tax. The "alternative" method is just that: it is to be used in those cases, and only those cases, in which it produces a lower tax.

In this case, the statutory language is plain and unambiguous. It has been well understood for four decades in cases involving individual and corporate taxpayers. In view of this clarity and consistency of interpretation, the burden of

---

the regular manner at the prescribed rate, or taxed separately at a flat rate, according to which method produces the lesser tax." *Weil* v. *Commissioner*, 23 T. C. 424, 428–429 (1954), aff'd, 229 F. 2d 593 (CA6 1956).

[10] In two especially thoughtful opinions, the Tax Court upheld this interpretation with respect to individual and corporate taxpayers, finding it to be mandated by the plain words and legislative history of the statutory provisions involved. See *Weil* v. *Commissioner, supra; Chartier Real Estate Co.* v. *Commissioner*, 52 T. C. 346, 350–356 (1969), aff'd, 428 F. 2d 474 (CA1 1970). In its opinion today, the Court does not in any way question the soundness of these decisions. Instead it has fashioned a special rule, applicable only to fiduciaries.

[11] *Weil* v. *Commissioner, supra,* at 432.

demonstrating that the same language should be read differently for fiduciaries is especially heavy. In my judgment, petitioners have completely failed to carry that burden.

## II

Petitioners make no attempt to explain why the calculation of the alternative capital-gains taxes of estates and trusts should be any different from the calculations of such taxes for individual and corporate taxpayers. Nor do petitioners point to any statutory language which even arguably supports the different meanings they attach to the term "excess" in §§ 1202 and 1201 (b). Instead, they contend that the Government has ignored the plain meaning of the term "excess" with respect to capital gains set aside for taxable beneficiaries and therefore should do the same—at least in the calculation of the alternative tax—when the beneficiaries are charitable.[12]

In my view the Government has been faithful to the statute in its treatment of distributions to taxable beneficiaries, as well as in its treatment of charitable contributions. It is true, as petitioners argue, that the Government allows estates to exclude distributions to taxable beneficiaries from the "excess" long-term capital gains used in the alternative tax computations. But such distributions are also excluded from the "excess" in making the normal calculation pursuant to § 1202. The reason for this treatment is clear, and is critical in undermining petitioners' argument.

---

[12] Were it in fact the case that the Government's interpretation of "excess" with respect to distributions to taxable beneficiaries is inconsistent with the statute, that would hardly establish that it should apply the same incorrect interpretation when the beneficiaries are not taxable. It would only suggest that the Government ought to address and correct the mistaken interpretation. An error is not cured by compounding it, nor does a taxpayer have a right to be freed of a correct calculation of his taxes because the Government may have erred with respect to a different class of taxpayers.

The express language of § 1202, which prescribes the normal deduction for capital gains, directs estates and trusts to *exclude* from their calculation of "excess" all amounts which are included in the income of taxable beneficiaries.[13] Consistency in making the sequential calculations prescribed by §§ 1202 and 1201 (b) mandates a similar exclusion from "such excess" with respect to both provisions; otherwise, the statutory scheme of the alternative method would be frustrated. For, as has already been noted, the first half of "such excess" is deducted under § 1202 and the other half of the same excess is deducted in the partial tax computation under § 1201.

The Government's reading of the statute not only gives the word "excess" a consistent meaning, but also effectuates the clearly stated intent of Congress expressed in §§ 661 (a) and 662 (a) of the Code. Those sections provide, as the majority so strongly emphasizes, that the estate is a mere conduit with respect to income distributed to taxable beneficiaries. In purpose and effect, they reflect a legislative decision to avoid a double tax on the same income and to place the burden of paying the single tax which is due on the beneficiary. The Government's interpretation of "excess" in § 1202 and § 1201 (b), which excludes from the estate's income the amounts included in the income of the taxable beneficiary under § 662 (a), clearly serves these purposes; any other interpretation would result in the double taxation of estate income which Congress, as the majority recognizes, has clearly sought to avoid.[14]

---

[13] "In the case of an estate or trust, the deduction shall be computed by excluding the portion (if any), of the gains for the taxable year from sales or exchanges of capital assets, which, under sections 652 and 662 (relating to inclusions of amounts in gross income of beneficiaries of trusts), is includible by the income beneficiaries as gain derived from the sale or exchange of capital assets." 26 U. S. C. § 1202 (1964 ed.).

[14] Effectuation of that intent also explains the other departures from the literal meaning of § 1201 in the cases cited *ante*, at 187–188, n. 8.

Obviously, there is no risk of double taxation when the beneficiary is a charity: The only potential taxpayer is the estate itself and the only question is how much tax it shall pay.[15] When there are two potential taxpayers—the estate and the beneficiary—the total tax on the income of the estate is the sum of the taxes paid by both. Thus, while petitioners are technically correct in arguing that the *estate's* taxes in this case would have been lower, under the Government's interpretation, if the entire capital gain had been distributed to taxable beneficiaries, this argument ignores the taxes paid by the beneficiaries on their receipts from the estate. By treating the trust as a mere conduit for the income distributed to taxable beneficiaries, Congress shifted the tax burden without changing the amount of income subject to tax or imposing a double tax burden on the same income.[16]

Thus, whether one focuses on the word "excess" in connection with distributions to charities, or in connection with distributions to taxable beneficiaries, the Government ascribes the same meaning to the term in § 1201 as in § 1202. The Government's conclusion that § 1202's express direction to exclude distributions to taxable beneficiaries requires a like exclusion in § 1201 merely illustrates the paramount impor-

---

[15] In calculating its taxable income under the normal method, the estate is, as the Court emphasizes, permitted under § 642 (c) a deduction "without limitation" for its charitable contributions. But this provision for charitable deductions "without limitation" serves only to free fiduciaries from the percentage limitations of § 170 (b) applicable to individual taxpayers; it does not, in itself, support or establish "conduit" treatment for charitable contributions in the calculation of the alternative tax.

[16] Petitioners also argue that because the estate's capital-gains tax must be paid out of the residue, the effective rate of the tax on the beneficiaries may exceed the 25% ceiling the alternative tax provisions were designed to impose. See *ante*, at 194–195. The ceiling on the tax on the estate's $500,000 gain in 1967 amounted to $125,000. This litigation involves a dispute over whether the estate's total tax in 1967 amounts to $88,000 or only $70,800. Petitioners do not explain how the resolution of that dispute can have the effect of breaking through the $125,000 ceiling.

tance of giving the word "excess" the same meaning in both sections. It surely provides no support for petitioners' remarkable contention that two halves of the same excess are unequal.

### III

In final analysis, this case requires us to consider how the law in a highly technical area can be administered most fairly. I firmly believe that the best way to achieve evenhanded administration of our tax laws is to adhere closely to the language used by Congress to define taxpayers' responsibilities. Occasionally there will be clear manifestations of a contrary intent that justify a nonliteral reading, but surely this is not such a case.

I respectfully dissent.